766 F.2d 690
 Michael J. OLIVIERI, J. Matthew Forman, Michael Dillinger,
Tom Kohler, Richard Ferrara, Edmund W. Trust, Hugh R. Bruce,
John D. Edwards, Joseph Brown, Julius J. Spohn, Bernard L.
Tansey, Clint Winant, David Lawlor, Jim Cannon, James Doyle,
Ned Lynam, Edward Byrne, Michael Conley, Edward Harbur,
Robert J. Buel, Christopher Wesolowski, Gary W. Spokes and
Dignity-New York, Plaintiffs- Appellees, Cross-Appellants,
v.
Benjamin WARD, in his official capacity as Police
Commissioner of the City of New York, Edward I. Koch, in his
official capacity as the Mayor of the City of New York, and
the New York City Police Department, Defendants-Appellants,
Cross-Appellees.
 Nos. 1548, 1552, Dockets 85-7509, 85-7511.
 United States Court of Appeals,
Second Circuit.
 Argued June 25, 1985.
Decided June 28, 1985.
 
 Stephen J. McGrath, New York City (Leonard Koerner, David Drueding, Jonathan L. Pines, Frederick A.O. Schwarz, Jr., Corp. Counsel of City of New York, New York City, of counsel), for defendants-appellants, cross-appellees.
 Stuart W. Gold, New York City (Valerie Caproni, Anne E. Verdon, New York City, of counsel), for plaintiffs-appellees, cross-appellants.
 Before KEARSE, CARDAMONE and FRIEDMAN,* Circuit Judges.
 CARDAMONE, Circuit Judge:
 Before St. Patrick's Cathedral on New York City's Fifth Avenue is a 250 foot long public sidewalk whose width from the private steps of the Cathedral to the curb of Fifth Avenue is about 25 feet. Plaintiffs are members of a gay and lesbian Catholic group, Dignity-New York, claiming their right to freedom of speech. They seek to place 100 of their members on this sidewalk before the church to conduct a religious demonstration during the annual Gay Pride March. Defendants are the Police Commissioner and the Mayor of New York City and the City Police Department. Urging that its obligation to protect public order compels it to impose limits on the time, place and manner of plaintiffs' demonstration, the Police Department proposes "freezing" (clearing) the sidewalk during the parade. Instead, it has set aside a demonstration area for plaintiffs on 51st Street, adjacent to the Cathedral, and a similar designated area on 50th Street for anti-gay demonstrators.
 Courts have the solemn responsibility when the First Amendment rights of a minority clash with the rights of others to preserve one while maintaining the other, without sacrificing either. Translating cherished freedoms enshrined in our Constitution to the harsh realities of the street is not an easy task. Because the excuses offered for refusing to permit the fullest scope of free speech often are disguised, a court must carefully sort through the reasons offered to see if they are genuine. In this case we believe they are. For the last two years a fair format for Dignity's demonstration on this occasion has evolved, which this year plaintiffs seek to expand. In order to maintain plaintiffs' rights while safeguarding the rights of the anticipated 75,000 marchers, those attending Sunday church services at the Cathedral, and the public, the same general scenario as that followed in 1983 and 1984 should be adhered to again this year.
 * Plaintiffs Dignity-New York and a number of its members brought this action for declaratory and injunctive relief in the United States District Court for the Southern District of New York. Plaintiffs sought an order enjoining the Police Department from carrying out its plan to close off the sidewalk in front of St. Patrick's Cathedral during the "Gay Pride March" along Fifth Avenue scheduled for this Sunday June 30, 1985, and thereby denying Dignity the right to demonstrate on the sidewalk during the march. Plaintiffs moved pursuant to Fed.R.Civ.P. 65 for a preliminary injunction.
 By order dated June 18, 1985 the district court (Motley, Ch. J.) issued an order enjoining defendants from preventing a "reasonable" number of Dignity members from holding a demonstration on the Cathedral sidewalk, but expressly not prohibiting defendants from exercising their professional judgment to maintain order. The Police Department has appealed this order claiming that its plan constituted a reasonable time, place and manner restriction on plaintiffs' First Amendment rights and that the district court abused its discretion by improperly substituting its judgment for that of the Police Department in weighing and determining the threat to public order. Plaintiffs also appeal claiming that the district court abused its discretion by issuing an order that was impermissibly vague because it failed to state a specific number of Dignity members that may remain on the Cathedral sidewalk. For reasons that follow, the order should be reversed and the preliminary injunction vacated.
 
 II
 
 1
 As described by plaintiffs, the "Gay Pride March" is "the major public demonstration organized by the local gay and lesbian community every year." The march was first held in New York City in 1970, and over the years the Police Department and the march's organizers have established a cooperative relationship that has helped to make the annual march a success. Last year approximately 75,000 people participated. While the marchers have generally proceeded without incident, they have not been free of harassment and violence by anti-homosexual demonstrators. During the 1981 march some participants, including members of Dignity, were assaulted on the steps of St. Patrick's Cathedral by self-appointed "protectors" of the Cathedral. As a result, the police detail was increased in 1982, but the sidewalk remained open. During the 1982 march, there were several instances in which provocative words were exchanged between demonstrators and counter-demonstrators, but no violence resulted. From 1976 through 1982 Dignity members stepped out of the line of march and gathered on the steps at the front of Fifth Avenue entrance of St. Patrick's Cathedral and there participated in a prayer service that continued through the duration of the march.
 
 
 2
 During the 1983 and 1984 parades the steps and sidewalk directly in front of St. Patrick's Cathedral were closed. Dignity officers were permitted to stop the line of march to lay a wreath on the sidewalk in front of the Cathedral and to hold a short prayer service in the street for 10-15 minutes. Both in 1983 and 1984 approximately 100 anti-gay demonstrators appeared. This year, as usual the parade will commence at Central Park South and run to the end of Fifth Avenue at Washington Square in Greenwich Village. The Police Department indicated that it would follow the same course for this year's march as it followed in 1983 and 1984, that is, closing the sidewalk but permitting Dignity officers to conduct a short prayer service on the street in front of the Cathedral and to lay a wreath.
 
 
 3
 Less than two months ago Dignity instituted this action seeking to extend the demonstration rights granted them in 1983 and 1984. Plaintiffs want to locate 100 of their members on the sidewalk in front of the Cathedral for the duration of the march so that their demonstration may be witnessed by all the marchers. It is estimated that it will take several hours for the entire parade to pass a single spot. The Police Department avers that it does not have at hand sufficient resources to control what--in New York City Police Commissioner Ward's opinion--is a reasonable risk of a riot on Fifth Avenue were such a sidewalk demonstration to be permitted during a march of this year's size.
 
 
 4
 The district court concluded that any fear that the Gay Pride March in general and the Dignity demonstration in particular will attract more violence this year than in past years was merely "speculative." The hearing record contains strong unrefuted evidence to the contrary. First, several lawsuits have been commenced against the City by groups attempting to enjoin the holding of the parade. Second, Catholic War Veterans and Knights of Columbus members have expressed strong opposition to gays gathering near the Cathedral. They and a group designated as the Committee to Defend the Cathedral are sending literature and mailings in an effort to recruit anti-gay demonstrators. Last year, some members of these groups overran the police barriers and claimed the police had "double-crossed" them by permitting Dignity to hold a service. Third, over the past year the Catholic Archdiocese of New York has taken a strong stand publicly against the economic interests of gay people by refusing to hire them. Fourth, Dignity members in the past year have demonstrated more than once at the Cathedral. Fifth, this year's parade organizers met with the police in late May 1985 to inform them that according to their own "highly reliable" sources a large number of Orthodox Jews from Brooklyn planned to block the parade route near 49th Street. The Grand Marshall of last year's parade said that if the police failed to remove the Jewish demonstrators forcibly, the marchers would. The police have considered all this information and as a result of their own investigation credit much of it. The police believe that the parade this year will be more volatile than in the past.
 
 
 5
 For these reasons, the City Police Department has concluded that prudence dictates that it must take reasonable precautions to protect the marchers and the public from violence. It is the Department's position that no one should be allowed to demonstrate on the sidewalk in front of the Cathedral. The unrefuted testimony in the record establishes that it is Police Department policy not to permit demonstrations adjacent to the line of march, and not to permit demonstrations by antagonistic groups to be held near each other. Finally, this is not the only occasion when the sidewalk in front of a church has been closed to the general public. During the St. Patrick's Day Parade, and most others, the sidewalk in front of St. Patrick's is "frozen." The same is done, according to police testimony, with the sidewalk in front of Fifth Avenue's Temple Emanuel.
 
 III
 
 6
 Although the right of access to a public forum for the discussion and interplay of ideas is fundamental in our democratic system, that right is not absolute. It is established that "reasonable 'time, place and manner' regulations may be necessary to further significant governmental interests." Concerned Jewish Youth v. McGuire, 621 F.2d 471, 473 (2d Cir.1980) (quoting Grayned v. City of Rockford, 408 U.S. 104, 115, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972)). The Police Department claims that its plan to freeze the sidewalk in front of St. Patrick's Cathedral during the Gay Pride March is such a reasonable time, place and manner limitation.
 
 
 7
 The standard to be employed in evaluating such a restriction, as the court below recognized, is:
 
 
 8
 1. It must be content-neutral;
 
 
 9
 2. It must be narrowly tailored to serve a significant governmental interest; and
 
 
 10
 3. It must leave open ample alternative channels for communication.
 
 
 11
 Clark v. Community for Creative Non-Violence, --- U.S. ----, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). This Court's standard of review on appeal of a preliminary injunction is "whether issuance of the preliminary injunction, in light of the applicable legal standards, constitute[s] an abuse of discretion." LeSportsac, Inc. v. K Mart Corp., 754 F.2d 71, 74 (2d Cir.1985) (citing Doran v. Salem Inn, Inc., 422 U.S. 922, 931-32, 95 S.Ct. 2561, 2567-2568, 45 L.Ed.2d 648 (1975)). When evaluating whether the district court abused its discretion, we must let its findings of fact stand unless we find that they are clearly erroneous.
 
 
 12
 Dignity asserts that the Police Department's proposed freeze of the sidewalk is not content-neutral because it is an ad hoc response to one specific controversy, that is a kind of "heckler's veto." On the contrary, the undisputed testimony on the record plainly shows that this action is completely consistent with an established policy of the Police Department to keep demonstrators away from the line of march of a parade, and to keep demonstrators and counter-demonstrators away from each other. The Department has developed this common sense policy in order to uphold its statutory obligation to "preserve public peace," to disperse "assemblages which obstruct the free passage of public streets, sidewalks, parks, and places," and to "protect the rights of persons and property." New York City Charter Sec. 435. In this case the restriction is being imposed on plaintiffs and their adversaries, both of whom have expressed to the Department a desire to occupy the same Cathedral sidewalk during the same June 30th March.
 
 
 13
 Further, the restriction has been narrowly tailored to further an important government objective. Unquestionably, maintenance of the public order is such an aim. Here, the Police Department fears an outbreak of violence during a march with an estimated 75,000 participants. The district court found no such danger of violence. After an exhaustive review of the hearing record, we can come to no other conclusion than that the district judge's finding on this point is clearly erroneous. The record shows, as noted, that what has always been a confrontation situation promises to become much more volatile this year. Given this fact, the Department has not proposed that the demonstrators be silenced, it seeks only to keep the demonstrations a reasonable distance from both the marchers and from each other.
 
 
 14
 Finally, the demonstrators have been afforded ample alternative channels for communication. The Police Department's proposal would allow the Dignity demonstrators to demonstrate in a side street near the Cathedral. It would also permit them, as in the past two years, to stop the parade, conduct a short service in the street in front of the Cathedral, and to lay a wreath on the Cathedral sidewalk. Thus the group is not stopped from conveying its message. They are merely not being allowed their preferred forum for demonstration.
 
 
 15
 Dignity argues that the threat of disruption and possible violence by anti-gay demonstrators does not justify the police ban on use of the sidewalk by Dignity to conduct its demonstration as it is the police's responsibility to curb hostile demonstrators. We cannot agree. The fundamental responsibility of the police is to preserve public order and protect the marchers; the police legitimately are concerned that they could not perform those functions if Dignity conducted its proposed sidewalk demonstration. This type of determination is uniquely within the Police Department's expertise. It is no answer to say that the police nevertheless should find some way to accomplish those objectives while permitting the very Dignity demonstration that threatens the ability of the police to maintain control of the situation.
 
 
 16
 Accordingly, we hold that the district court abused its discretion by issuing the preliminary injunction. The order of the district court is therefore reversed, the injunction vacated, and the matter remanded to the district court with directions to order defendant to permit Dignity no less an opportunity to demonstrate than in 1983 and 1984. That is, Dignity should be allowed to demonstrate on a side street near the Cathedral and to halt the parade to conduct a short prayer service on Fifth Avenue in front of the Cathedral, which service includes laying a wreath on the Cathedral sidewalk.
 
 KEARSE, Circuit Judge, dissenting:
 
 17
 Though I think this case presents difficult practical and conceptual questions, and although I would modify the district court's injunction for the sake of clarity and enforceability, I respectfully dissent from the majority's decision to vacate the district court's preliminary injunction prohibiting defendants (collectively the "Police Department" or "Department") from barring plaintiffs from using the sidewalk in front of St. Patrick's Cathedral for a demonstration during the "Gay Pride March" scheduled for June 30, 1985.
 
 
 18
 The standard in this Circuit for the issuance of a preliminary injunction requires the moving party to establish (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) a sufficiently serious ground for litigation and a balance of hardships tipping decidedly in its favor. E.g., Sperry International Trade, Inc. v. Government of Israel, 670 F.2d 8, 11 (2d Cir.1982); Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979) (per curiam). The ultimate question on appellate review of a district court's issuance of a preliminary injunction is whether, in light of the applicable standard, the court has abused its discretion. Doran v. Salem Inn, Inc., 422 U.S. 922, 931-32, 95 S.Ct. 2561, 2567-2568, 45 L.Ed.2d 648 (1975); Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 206 (2d Cir.1979). Such an abuse of discretion may take the form of an erroneous view of the law, or error in findings of fact, or error in the form of the injunction. E.g., Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 315 (2d Cir.1982).
 
 
 19
 Since "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976); see also 414 Theatre Corp. v. Murphy, 499 F.2d 1155, 1160 (2d Cir.1974), the sole question on this appeal, apart from the form of the injunction, is whether the district court erred in ruling that plaintiffs had shown a likelihood of success on the merits of their claim.
 
 A. The Merits of the First Amendment Claim
 
 20
 The claim of the plaintiffs, who are Catholic homosexuals, is that the sidewalk in front of St. Patrick's Cathedral is a public forum that is uniquely suited to the message they wish to convey, which is that notwithstanding the disapproval of their homosexuality by the Catholic Archdiocese of New York, they wish to remain within the mainstream of Catholicism; that they have a First Amendment right to use that forum to express this message; and that the Department's plan to deny them access to that forum by barring virtually all speech from the sidewalk during the March abridges that right. Since there can be little doubt that the sidewalk in front of St. Patrick's is a "quintessential public forum[ ]," Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983); accord United States v Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983); Carey v. Brown, 447 U.S. 455, 460, 100 S.Ct. 2286, 2289, 65 L.Ed.2d 263 (1980); Hudgens v. NLRB, 424 U.S. 507, 515, 96 S.Ct. 1029, 1034, 47 L.Ed.2d 196 (1976), the focus must be on whether the Department's special plan to close that forum to plaintiffs' group during the March was a valid "time, place, and manner" regulation, i.e., one that was "justified without reference to the content of the regulated speech, that ... [was] narrowly tailored to serve a significant governmental interest, and that ... le[ft] open ample alternative channels of communication of the information." Clark v. Community for Creative Non-Violence, --- U.S. ----, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); accord United States v. Grace, 461 U.S. at 177, 103 S.Ct. at 1706; Perry Education Association v. Perry Local Educators' Association, 460 U.S. at 45, 103 S.Ct. at 954.
 
 
 21
 The Police Department's response to plaintiffs' current request to use the Cathedral sidewalk in a parade-long ceremony was, as it was in 1983 and 1984, to prohibit their use of the sidewalk entirely except to permit the parade to pause when it reaches St. Patrick's for a 15-minute ceremony in the street, and to permit one or two members of plaintiffs' group to enter the Cathedral sidewalk to lay there a symbolic wreath. The Department would also permit plaintiffs to conduct a parade-long ceremony on a side street across from the Cathedral. The Department's view is that any greater use by plaintiffs of the sidewalk in front of St. Patrick's would unreasonably increase the risk of violence.
 
 
 22
 The risk of violence comes not from the plaintiffs, as defendants concede, but from groups hostile to plaintiffs.[1] However, the implementation of but two of the Department's usual policies should suffice to minimize the risk of violence without any need to bar plaintiffs from the Cathedral sidewalk. First, the Department's general policy is to separate mutually antagonistic demonstrations by the distance of at least one city block and to keep such demonstrations out of sight and hearing of each other. Second, its policy is to prohibit hostile demonstrations from occupying the sidewalk directly adjacent to a parade possessing an official permit.[2] Implementation of these policies would appear to provide the safeguards normally established by the Department even if plaintiffs' group were to occupy the sidewalk in front of St. Patrick's.
 
 
 23
 It is clear from the record, and counsel for the Department conceded at oral argument of this appeal, that if it were not for the threats of certain anti-gay Catholic groups, plaintiffs' group would be permitted to use the Cathedral sidewalk. Further, according to a Department official, the Catholic anti-gay groups would be perfectly satisfied with the Department plan to bar everyone from the Cathedral sidewalk since their primary goal is to prevent plaintiffs' group from occupying that location. The latter fact confirms plaintiffs' contention that the Cathedral sidewalk is a forum of especial symbolic significance for their message.
 
 
 24
 Given these facts, it becomes clear that the only reason the Department seeks to bar plaintiffs' group from the Cathedral sidewalk is because of the threats of the anti-gay groups. This response by the Department, in lieu of reliance on its more usual policy of providing a one-block buffer zone from whatever the site of plaintiffs' demonstration may be, plainly has given the Catholic anti-gay groups a classic "heckler's veto." Such a veto has consistently been rejected by the courts as a valid basis for restricting the exercise of free speech in a traditional public forum, see, e.g., Coates v. City of Cincinnati, 402 U.S. 611, 615-16, 91 S.Ct. 1686, 1689, 29 L.Ed.2d 214 (1971); Bachellar v. Maryland, 397 U.S. 564, 567, 90 S.Ct. 1312, 1314, 25 L.Ed.2d 570 (1970); Gregory v. Chicago, 394 U.S. 111, 117, 89 S.Ct. 946, 949, 22 L.Ed.2d 134 (1969); Terminiello v. City of Chicago, 337 U.S. 1, 4-5, 69 S.Ct. 894, 895-896, 22 L.Ed.2d 134 (1949); Wiegand v. Seaver, 504 F.2d 303, 306 (5th Cir.1974), cert. denied, 421 U.S. 924, 95 S.Ct. 1650, 44 L.Ed.2d 83 (1975); Beckerman v. City of Tupelo, 664 F.2d 502, 509-10 (5th Cir.1981); Collins v. Chicago Park District, 460 F.2d 746, 754-55 (7th Cir.1972), and was, in my view, properly rejected by the district court here.
 
 
 25
 The Department argues that allowing plaintiffs to use the sidewalk while denying such use to the anti-gay counterdemonstrators would impair the content-neutrality of its policies. I view this invocation of First Amendment doctrine in order to bar virtually all expression from an area in which at least one group's speech would otherwise be fully permitted under the Department's usual policies as an untoward ironic twist. The essence of the Amendment is to promote speech rather than to inhibit it. The Department's argument suggests that whenever two groups seek to speak in the same public place at the same time, if both cannot be simultaneously accommodated both should be prohibited from speaking. The notion of content-neutrality mandated by the First Amendment surely does not lead to such a result. Rather, that principle requires that when there are more individuals or groups seeking to use a public forum than can safely be accommodated, the state must select from among them on a basis other than its evaluation of the view that each seeks to express. Here, the Department refused to make any selection at all, whether through the application of its usual policies or otherwise, and, by a misguided invocation of content-neutrality, it seeks unnecessarily to restrict the speech of all.
 
 
 26
 I do not view the Supreme Court's language in Clark v. Community for Creative Non-Violence, 104 S.Ct. at 3072, as requiring substantial deference to the view of the Police Department in this matter. In Clark, the Court intimated that the judiciary should not second-guess the Park Service's balancing of interests which led to its policy of restricting overnight camping in the parks to designated areas. The regulation there at issue particularized a longstanding policy of the Park Service that was directed primarily at the regulation of camping, not of expression. See 36 C.F.R. Sec. 50.27(a) (1984); 24 Fed.Reg. 11,014 (1959). In the present case, the challenged plan was one designed directly to regulate freedom of expression, and I think the district court was required to evaluate that response within the traditional analytical framework.
 
 
 27
 As to the Department's concerns for protecting the safety of participants in the parade and other members of the public, which of course are conceptually legitimate, the district court found that the Department had overstated the danger of a confrontation in the event plaintiffs' group were permitted to occupy the Cathedral sidewalk. I see no basis in the record to hold this finding clearly erroneous; and even if the "independent appellant review" standard suggested in Bose Corp. v. Consumers Union of United States, 466 U.S. 485, 104 S.Ct. 1949, 1967, 80 L.Ed.2d 502 (1984), were to apply, I would not consider the district court's finding erroneous. The record shows that a Gay Pride March has been held each year since 1970; plaintiffs' group, Dignity of New York, has conducted a special service in front of St. Patrick's each year since at least 1976; prior to 1983, Dignity's special service was conducted on the steps and sidewalk in front of St. Patrick's throughout the parade; in 1981, there were two isolated instances of violence, each instigated by and involving a single anti-gay individual; in the following year, plaintiffs' group conducted the same type of parade-long ceremony as it had in 1981 on the Cathedral steps and sidewalk, and there were no incidents. In recent years the Department has annually predicted that there would be massive violent confrontations between gays and anti-gays in the area around St. Patrick's during the March; but except for the two minor incidents in 1981, there has been no violence attendant upon the March or plaintiffs' special proceedings.
 
 
 28
 In light of this record, and in light of the Department's standard policy of maintaining a one-block buffer zone between mutually antagonistic demonstrations, I would not upset the district court's finding that the Department's concern for safety was not sufficiently particularized and well-grounded in fact to justify its blanket ban of plaintiffs from the Cathedral sidewalk. I conclude that the district court applied the correct legal principles, that its findings of fact were not erroneous, and that the granting of injunctive relief in plaintiffs' favor was not an abuse of discretion.B. The Form of the Injunction
 
 
 29
 Notwithstanding my agreement with the district court that an injunction permitting plaintiffs to occupy the Cathedral sidewalk is appropriate, I believe the injunction as entered is not sufficiently "specific in terms," Fed.R.Civ.P. 65(d). While often it may suffice to order a party to proceed in a "reasonable" manner, it appears to me that the inflexible position taken by the Department forecloses such an approach here.
 
 
 30
 The Department adheres to the position that it is unreasonable to permit more than one or two members of plaintiffs' group to enter the Cathedral sidewalk. If, in the face of that adherence, the court orders only that plaintiffs be permitted to enter that area in "reasonable" numbers, the Department may arguably proceed on the basis that its view of what is reasonable has not been rejected by the court. This would make it difficult on June 30 for plaintiffs to show on-the-scene officials an order requiring that more than one or two of them be allowed on the sidewalk, and difficult thereafter to obtain judicial enforcement of the court's order in the event those officials are unpersuaded on June 30.
 
 
 31
 At the hearing below, the court appeared to reject the Department's position that one or two constituted the largest number of plaintiffs' group that could reasonably be permitted on the Cathedral sidewalk, and appeared to indicate that it considered plaintiffs' proposed 100 to be reasonable. While it is difficult to quantify precisely what is "reasonable," it appears to me that, in the face of the Department's adamant refusal to exercise any discretion as to what number greater than one or two may be reasonable, the court should, for the protection of both sides, specify a number.
 
 
 32
 Accordingly, I would be inclined to construe the district court's use of the term "reasonable" as meaning approximately 100, and would direct (1) that the injunction be thus clarified, or (2) that the district court clarify the injunction by inserting in it such other number as that court considers more appropriate.
 
 
 
 *
 Honorable Daniel M. Friedman, Circuit Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 This factor distinguishes the present case from Concerned Jewish Youth v. McGuire, 621 F.2d 471, 473 (2d Cir.1980), where this Court upheld a Department policy of restricting those who sought to demonstrate in front of the Russian Mission to a "bullpen" more than 100 feet from the Mission's entrance. There, it was the demonstrators themselves who posed the threat of violence, which threat was inherent in their proximity to the Mission. Here, by contrast, any threat of violence comes not from plaintiffs but from the anti-gay counterdemonstrators
 
 
 [2]
 The majority states this second policy as prohibiting all demonstrations from occupying a sidewalk directly adjacent to a parade. I find no support for this in the record. Not only were plaintiffs themselves permitted to conduct such a demonstration on the steps and sidewalk in front of St. Patrick's in conjunction with the March prior to 1983, but Catholic leaders and their invited guests, sometimes numbering several hundred, are consistently permitted to occupy the sidewalk in front of the Cathedral and to greet dignitaries passing in the line of march during, for example, the St. Patrick's Day Parade, the Puerto Rican Day Parade, and the Columbus Day Parade. Further, as discussed infra, the Department has conceded that if there were no threat of hostile counterdemonstrations, plaintiffs' use of the sidewalk in front of the Cathedral would be permitted