Renee VICARY and Angel's Nightclub, Inc., a California corporation, dba Angel's Nightclub, Plaintiffs,

v.

CITY OF CORONA, a municipal corporation, Defendant.

No. CV95–5994–R.

United States District Court, C.D. California.

Aug. 6, 1996.

Roger Jon Diamond, Santa Monica, California, for plaintiffs.

Meredith Jury, Best Best & Krieger, Riverside, California, for defendant.

## OPINION

REAL, District Judge.

Plaintiffs RENEE VICARY AND ANGEL'S NIGHTCLUB, INC. (VICARY) filed this action to enjoin the defendant CITY OF CORONA, CALIFORNIA (CORONA) from enforcing a CORONA zoning ordinance prohibiting any "live adult entertainment establishment" from operating within 750 feet of a residentially zoned lot, or school, church, park or library attended by minors measured from lot line to lot line. For the reasons stated below, VICARY'S motion is granted.

## BACKGROUND

In July 1992 VICARY purchased the property located at 1650 East Sixth Street, in Corona. This property was then zoned as M–3 permitting heavy manufacturing. It was occupied by twin buildings connected by a kitchen facility. When VICARY acquired this property it was occupied by a club called KNOCKERS that served food and provided various forms of live entertainment, none that involved what is described in the CORONA ordinance, in issue here, as "adult entertainment."

From the time of VICARY'S acquisition of the property it has been operated as a sports bar in one of the buildings and a country western bar in the other building. VICARY owns a license both for the sale of alcoholic beverages and presentation of live entertainment. VICARY claims to be losing money in the operation of the sports and western bar

and desires to provide topless live adult entertainment at this location. VICARY has since mid–1994 continuously advised CORONA of her desires in this regard. CORONA claims that this location does not meet the requirements of the amendment to Chapter 17.41 of its Municipal Code as adopted by Ordinance No. 2246.

Chapter 17.41 of CORONA'S Municipal Code was initially enacted to regulate the location within the city's commercially zoned areas of sexually-oriented businesses. With the passage of Ordinance No. 2099 on March 18, 1992 CORONA amended Chapter 17.41 to restrict "live adult entertainment" to general commercial zones and required such establishments to obtain a Conditional Use Permit (CUP) from the City Planning Commission before opening.

Not satisfied with the amendment made by Ordinance No. 2099, CORONA adopted Ordinance No. 2177 on September 20, 1993 to place a moratorium on the establishment of adult entertainment businesses to prevent any such businesses from opening in locations that might conflict with proposals for further amendment of Ordinance No. 2099. The moratorium was twice extended to end on September 20, 1995.

The version of Chapter 17.41 here in issue was finally adopted in Ordinance No. 2246 on April 19, 1995. Chapter 17.41 § 17.41.020(E) defined "live adult entertainment establishment" as including but not "limited to those providing nude or topless entertainment." Thus, this provision regulated VICARY'S wish to offer topless entertainment at VICARY'S establishment, changing the ability to perform adult entertainment from the commercially zoned properties in Corona to those zoned M–3 and putting the distance requirement from residentially zoned property at 750 feet. Although the further hurdle of obtaining a CUP need not be articulated here, counsel for CORONA indicated at argument that CORONA would not issue such a permit for this location under any circumstances.

## PROPERTIES AVAILABLE FOR ADULT ENTERTAINMENT WITHIN THE CITY OF CORONA

In order to meet constitutionally permitted zoning requirements for the adult entertainment proposed by VICARY, CORONA has estimated that there are 27 M–3 sites available for such use consistent with Ordinance No. 2246. The available sites have been divided into four sections of the M–3 zoned properties in Corona.

Section A is a parcel located in the middle of an industrial park and which is owned by three private businesses. Although a non-commercial building owned by the Dart Corporation occupies most of the parcel, there is a vacant lot in the northwest corner of the property. This lot is barely accessible to any thoroughfare. The property's southern side is bordered by Pomona Rincon Road while Maple Street serves as its eastern boundary. The land is a quarter of a mile north from State Highway 91 off of Maple Street. Both Pomona Rincon and Maple have street lights as well as water and sewer lines that run underneath.

Section B has three adjacent parcels that potentially could be used for adult entertainment. All three parcels, which are held by the Hunsaker Trust, are vacant. Quarry Street borders Section B on its southern most side and has a water line running underneath. The area is accessible from Interstate 15 via the Magnolia Avenue exit, one mile from the site. Availability of this parcel is subject to considerable development—no off-site services are present on the property.

Section C holds 13 parcels which meet the requirements of the ordinance and could potentially serve as a site for an adult entertainment facility such as Angel's. East Sixth Street makes up part of this section's southern border while Promenade Avenue runs along its eastern side. Section C is surrounded on its western and northern side by Interstate 15 and State Highway 91 respectively. In addition to water and sewer lines that are under East Sixth Street, a water line also runs along the entire eastern side of Section C on Promenade. A third water line is perpendicular to the Promenade water line and cuts westward across Section C, literally bisecting the area. Street lights line the sides of both Promenade and East Sixth.

Of the 13 available parcels in Section C, three sit on East Sixth Street, another three can be found on Promenade while the remaining seven are landlocked. Each of the 13 parcels are either vacant or hold existing structures in which adult entertainment potentially could be presented. This area is approximately one and a half miles from the Magnolia Avenue off ramp from Interstate 15.

Section D has within its borders another 10 parcels which are suited for an adult entertainment business. East Sixth Street runs to the north of Section D while Magnolia Avenue cuts diagonally through the northern half of the area. Both East Sixth Street and Magnolia Avenue carry with it sewer and water lines. Of the 10 conforming parcels, two adjacent lots are vacant with Promenade Avenue serving as the parcels' eastern border. One parcel sits on the northern side of Magnolia while the other touches the southern end of East Sixth Street. Like Magnolia Avenue, Promenade also has both sewer and water lines which run underneath the street.

Seven of the remaining eight parcels can be found right on Magnolia and its accompanying water and sewer lines. Both Magnolia and East Sixth Street are intersected by and are accessible from Interstate 15.

Angel's is not located in any of the four sections. It sits adjacent to Section D and is across the street from Section C. The club is on the eastbound side of East Sixth Street. East Sixth Street is actually a well traveled four-lane highway with an 80–foot wide dirt median that splits the four lanes into a pair of two lanes with traffic flowing in each direction. The lot line of Angel's is less than 750 feet from two mobile home communities located in this area.

Across East Sixth Street, approximately 250 feet to the northeast of Angel's building, lies the Park Lane mobile home community. Trees and other thick vegetation such as bushes and low growing trees line a surrounding perimeter wall of the Park Lane community, hiding most of the mobile home park from the view of those using East Sixth Street.

Approximately 650 feet southeast of Angel's building and 400 feet from its property line is another mobile home park, the Corona La Linda community. Corona La Linda is also enclosed by a perimeter wall. Separating Angel's and Corona La Linda, which are both on the south side of East Sixth Street, is an industrial warehouse and storage yard for garbage trucks.

Neither of the mobile home parks are directly accessible from East Sixth Street and instead have only one entrance off of Temescal Street, which runs approximately 170 feet to the east of Angel's and intersects with East Sixth Street. In addition, within each park is its own internal street system.

Directly south of Angel's is both developed and vacant industrial property. The same can be said for the land west of Angel's while on the property directly north of Angel's and across East Sixth Street lies an office building.

Because the lot line of Angel's is less than 750 feet from the lot line of a residentially zoned lot i.e. the Park Lane and Corona La Linda communities, the presentation of topless dancing at Angel's is barred by Ordinance No. 2246. In fact, VICARY admits as much but contends that the ordinance was adopted for the specific purpose of preventing Angel's from offering topless entertainment to the public and that the changes in the ordinances and the moratorium enacted by Corona support that contention. In addition, VICARY argues that the regulation does not allow for a reasonable opportunity for relocation in Corona for the presentation of topless dancing. For both reasons, VICARY contends, the ordinance is unconstitutional.

On September 7, 1995, VICARY filed a complaint under 42 U.S.C. § 1983 for injunctive and declaratory relief. After hearings and extensive briefing by both parties, this Court now holds that while Ordinance No. 2246 passes VICARY'S constitutional facial challenge, it has been unconstitutionally applied to VICARY. Therefore, VICARY'S Motion for a Permanent Injunction is granted.

## THE CONSTITUTIONALITY OF
## ORDINANCE NO. 2246

█ The government must show a compelling interest in order to regulate or suppress the content of one's speech because it is either offensive or socially unacceptable. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46–47, 106 S.Ct. 925, 929, 89 L.Ed.2d 29, 37 (1986). To pass constitutional muster the regulation of conduct having only an incidental effect on speech may control such conduct with time, place and manner restrictions. *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221, 227 (1984). The marginal protection of adult entertainment, a specie of commercial speech, does not rise to the protection afforded political speech or the dissemination of ideas, *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). This is true even though the Supreme Court in *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 66, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671, 678 (1981) extended the protection of the First Amendment to nude dancing.

█ CORONA seeks the imprimatur of *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29, on its Ordinance No. 2246 claiming the ordinance is a content neutral, time, place, and manner regulation. That does not end the inquiry. As the Supreme Court said in *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972):

"The nature of a place 'the pattern of its normal activities, dictate the kinds of regulations of time, place and manner that are reasonable' ... The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time. Our cases make clear that in assessing the reasonableness of a regulation, we must weigh heavily the fact that communication is involved; the regulation must be narrowly tailored to further the State's legitimate interest" 408 U.S. at 116–117 [92 S.Ct. at 2303–04].

█ In enacting Ordinance No. 2246 the CORONA City Council notes in its preamble:

"[c]rime rates appear to be higher across the country in residential areas located near sexually oriented businesses than in commercial or industrial areas located near sexually oriented businesses, and therefore, an appropriate distance as a buffer between residentially zoned lots or lots upon which nonconforming residential uses are located and sexually oriented businesses is necessary to mitigate such negative secondary effect."

█ Again in *Renton* at 50, 106 S.Ct. at 930, supra, the Court reiterates that content neutrality and time, place and manner regulation does not alone save a regulation of adult entertainment. The regulation must be one that will "serve a substantial government interest and allows for reasonable alternative avenues of communication."

CORONA'S concern about enhancing public safety by maintaining low crime rates, particularly in its residential areas, clearly presents a substantial interest. However, relying on the approval of the findings made by the defendant in *Northend Cinema, Inc. v. City of Seattle*, 90 Wash.2d 709, 585 P.2d 1153 (1978), cert. denied sub. nom. *Apple Theatre, Inc. v. City of Seattle*, 441 U.S. 946, 99 S.Ct. 2166, 60 L.Ed.2d 1048 (1979), CORONA made little, if any, effort to determine the crime rate in CORONA or surrounding communities caused by reason of the existence of sexually oriented businesses, particularly of the topless dancing variety. Nor did CORONA make any effort to determine the effects of buffers to the "cause and effect" of topless dancing and crime. CORONA'S reliance on *Young v. American Mini Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), to support its concern for the maintenance of property values appears to be misplaced. Property values have little relationship to "preserve the quality of human life ..." *Young*, at 71, 96 S.Ct. at 2453.

CORONA'S isolation of adult entertainment establishments away from residential zones as well as schools, libraries, churches, community centers and the like is a legitimate goal of zoning regulations permitted by *Renton*, supra, if reasonably applied.

CORONA'S Ordinance No. 2246 passes facial muster under *Renton*, *Young*, and

*Grayned.* It is with the ability of applying the 750–foot separation of lot line to lot line that causes this Court to find the literal application of CORONA'S Ordinance No. 2246 unconstitutional.

### THE UNCONSTITUTIONAL APPLICATION OF ORDINANCE NO. 2246 TO PLAINTIFFS

■ A statute found to be facially valid, if it is enforced by the government in an excessively restrictive or burdensome manner against a particular individual or group, may be deemed unconstitutional as applied and the government will be enjoined from enforcing it against that party. *See Iskcon of Potomac, Inc. v. Kennedy,* 61 F.3d 949, 955–956 (D.C.Cir.1995).

■ While courts should generally defer to a legislature's determination of the most appropriate manner in which to address an issue facing a municipality, they must also stand guard to ensure that when the solution impinges upon the First Amendment, the substantial government interest is genuinely furthered. Because the access barriers standing between Angel's and the nearby residential communities serve as a sufficient buffer to satisfy the predominate purpose of Ordinance No. 2246, I find that the imposition of the separation requirements on VICARY in this case does not further the governmental interest and infringes upon plaintiffs' rights under the First Amendment. Moreover, there is no evidence that CORONA ever considered any alternatives to the 750–foot lot line to lot line restriction.

The issue of adequate buffers to mitigate secondary effects of adult entertainment appears to be one of first impression. In *Mitchell v. Commission on Adult Entertainment Establishments,* 10 F.3d 123 (3rd Cir. 1993), an adult bookstore challenged a Delaware state law restricting the hours of opera-

tion and requiring the removal of doors from its video viewing booths. The state legislature sought to limit the business hours of adult entertainment establishments because of the secondary effects such facilities could have on nearby residential areas. In arguing that the hours of operation restriction was not narrowly tailored, plaintiff pointed out that it was separated from the nearest residential community by an eight-lane highway with a four-foot concrete barrier dividing the northbound and southbound lanes and that there were no walkways connecting one side of the highway to the other. Plaintiff contended that the statute's objective of reducing late night noise, crime and sexually offensive materials and activities in the residential communities was already being served by the eight-lane highway.

The Third Circuit rejected plaintiff's argument, reasoning that a legislature need not "survey every adult book store in the state to determine the effect the statute or regulation will have on each." *Mitchell,* 10 F.3d at 138. In deciding to uphold the ordinance, the Court of Appeals stated that it is sufficient if a legislature shows that adult entertainment facilities as a class generate the secondary effects which it seeks to mitigate. *Id.* at 138.[1] Thus, the court concluded, the adult bookstore could not use the facts of its own situation to strike down the ordinance. However, the court never specifically addressed whether an ordinance could be found to be unconstitutionally applied because it failed to consider barriers which served as a buffer between residences and the regulated use.

■ *Mitchell* is distinguishable from this case because CORONA'S ordinance is not being struck down. I find such a remedy unnecessary. Instead, Corona should only be enjoined from unreasonably enforcing it against VICARY at its existing location.[2]

---

**1.** In *Mitchell,* the court also noted that plaintiff overlooked the existence of a second residential community directly across the street from the bookstore and on the same side of the eight-lane highway. *Id.* at 138 n. 19.

**2.** The City has also contended that since VICARY has failed to apply for a CUP, VICARY has not

exhausted its administrative remedies and no unconstitutional application or enforcement of the ordinance has occurred. In addition, Section 17.96.010 of the Corona Municipal Code allows VICARY to submit a request for a variance of the locational distance requirements which could theoretically take into account existing barriers. VICARY has not applied for a

Here, there are both artificial and natural conditions which would mitigate or block any secondary effects which could potentially impact on the nearby residential communities. The Corona La Linda community in particular is well protected. An industrial warehouse operated by Western Waste Systems as well as a storage yard for large trash trucks serves as a buffer between Angel's and Corona La Linda. A vacant parcel is positioned north of the mobile home park so that Corona La Linda is not accessible from East Sixth Street.

Similarly, the Park Lane community is set off from Angel's by East Sixth Street's four lanes and 80–foot wide median. Beyond this major thoroughfare are trees and thick bushes which further insulate Park Lane.

In addition, because each community is surrounded by a perimeter wall, it would be impossible in this case for a pedestrian to walk directly from Angel's to either mobile home community's lot line and come in contact with any residences. Instead, one must walk eastbound down East Sixth Street and turn down Temescal Street before reaching the sole entrance of either mobile home park.

 Thus, the location of Angel's Nightclub at 1650 East Sixth Street does not concern the real matters which were of interest to the city when it enacted the ordinance. While a narrowly tailored application of the ordinance does not require "the least restrictive or least intrusive means" of enforcement, the government may not "burden substantially more speech than is necessary" to further its interest. *Ward v. Rock Against Racism*, 491 U.S. 781, 798–799, 109 S.Ct. 2746, 2757–2758, 105 L.Ed.2d 661, 680–681 (1989). The burden imposed must serve to advance the government's goals. To bar VICARY from engaging in constitutionally protected activity would burden First Amendment freedoms more than "is essential to the furtherance of a governmental interest" because the residential communities are already protected from any ill effects. *Barnes*, 501 U.S. at 571–572, 111 S.Ct. at 2463, 115 L.Ed.2d at

515. Therefore, enforcement of the 750–foot separation requirement would burden substantially more speech than necessary in this case.

Courts have traditionally been called upon to carve out buffer zones that balance the need to protect certain groups or individuals while not abridging First Amendment freedoms. These situations often arise in cases involving abortion clinic protests and picketing over labor disputes. In abortion clinic cases, typically the clinic will request that a court issue an injunction barring abortion protestors from harassing clinic clients and from picketing within a certain distance of the clinic. Such requests force courts to weigh the potential danger posed by the protestors to the health of the clients against the protestors' right to free speech. Courts will carefully scrutinize the facts of a particular case and determine specific measures, if any, that need to be taken to protect both parties' rights. The result is often the creation of a buffer zone around the clinic which serves as a barrier between the protestors and the clients or clinic entrance. *See Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (Supreme Court upheld injunction creating 36–foot buffer zone around clinic entrances and driveway as well as certain noise restrictions but struck down 300–foot prohibition against picketing in front of clinic staffs' residences and 36–foot buffer zone around private property in back of clinic); *Pro–Choice Network of Western New York v. Schenck*, 67 F.3d 377 (2d Cir.1995) (Fifteen-foot buffer zone around abortion clinic and requirement that sidewalk "counselors" cease and desist counseling clinic patients once instructed by patients to do so held constitutional); *Fischer v. City of St. Paul*, 894 F.Supp 1318 (D.Minn.1995) (Court found that fenced in buffer zone around clinic created by city to keep out anti-abortion protestors was constitutional).

 Such decisions are difficult and are not guided by any exact science. Nonethe-

---

variance. It is clear that without a variance a CUP application by VICARY would be denied. However, based on the evidence this matter has already been prejudged by Corona and a variance request by VICARY would be futile. VICARY should not have to undergo a process for

which there is a foregone conclusion by CORONA before having its rights under the Constitution enforced. Moreover, Section 17.96.010 does not speak to the consideration of reasonable alternatives to the 750–foot lot line to lot line requirement.

less, they must be made to guarantee that our First Amendment rights are secured. "Courts have the solemn responsibility when the First Amendment rights of a minority clash with the rights of others to preserve one while maintaining the other, without sacrificing either. Translating cherished freedoms enshrined in our Constitution to the harsh realities of the street is not an easy task." *Olivieri v. Ward,* 766 F.2d 690, 691 (2d Cir.1985).

I find that under the present circumstances, the government failed to show that the existing barriers would not be a reasonable alternative to the 750–foot lot line to lot line separation requirement. The substantial interest in protecting against the secondary effects which would permit a 750–foot buffer is obviated by the barriers between VICARY'S establishment and any residential property in the area. This tips the scales in favor of VICARY exercising its First Amendment rights.

Courts have historically used their discretion to fine tune burdens on the exercise of First Amendment rights which have been placed on individuals and groups by regulation or injunction. The facts here require such an approach by this Court. Plaintiffs' Motion for a Permanent Injunction is GRANTED.