Michael J. OLIVIERI, J. Matthew Foreman, Michael Dillinger, Tom Kohler, Richard Ferrara, Edmund W. Trust, Hugh R. Bruce, John D. Edwards, Joseph Brown, Julius J. Spohn, Bernard L. Tansey, Clint Winant, David Lawlor, Jim Cannon, James Doyle, Ned Lynam, Edward Byrne, Michael Conley, Edward Harbur, Robert J. Buel, Christopher Wesolowski, Gary W. Spokes and Dignity-New York, Plaintiffs,

v.

Benjamin WARD, in his official capacity as Police Commissioner of the City of New York, Edward I. Koch, in his official capacity as the Mayor of the City of New York, and the New York City Police Department, Defendants.

No. 85 Civ. 3269 CBM.

United States District Court, S.D. New York.

June 13, 1986.

Stuart W. Gold, J. Pope Langstaff, Ronald K. Chen, Jennifer J. Raab, New York City, for plaintiffs.

Frederick A.O. Schwarz, Corp. Counsel of City of New York by David Drueding, Jonathan Pines, Asst. Corp. Counsel, New York City, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, Chief Judge.

Plaintiffs, Dignity-New York, which is an organization of gay Roman Catholics, and several of its individual members, seek to enjoin defendants on constitutional and statutory grounds from prohibiting them from demonstrating on the public sidewalk in front of St. Patrick's Roman Catholic Cathedral in New York City during the annual Gay Pride Parade this year. Plaintiffs' previous application in this case for preliminary relief of an identical nature with respect to the 1985 Parade, on which this court held a hearing of several days last year, was granted by the court on June 13, 1985. *Olivieri v. Ward*, 613 F.Supp. 616 (S.D.N.Y.1985). Subsequently, but prior to the actual date of the 1985 Gay Pride Parade, the Second Circuit reversed this court's order, finding that plaintiffs had failed to satisfy the necessary requirements for the exceptional remedy of pre-

liminary injunctive relief. *Olivieri v. Ward,* 766 F.2d 690 (2d Cir.1985).

Several months after the Second Circuit handed down its decision on the preliminary injunction motion, plaintiffs amended their complaint to seek a permanent injunction and declaratory relief against the police ban on Dignity's use of the St. Patrick's sidewalk during the June 1986 Gay Pride Parade and all Gay Pride Parades thereafter. From May 12 to May 21, 1986 a trial on the merits of plaintiffs' claim was held before this court.[1] In the course of this trial and its post-trial marshalling of the evidence, the court has observed that the great majority of facts in this case are undisputed. Indeed, many of them have been formally so denominated by the parties in the pre-trial order in this case. Other essentially undisputed facts revealed in the testimony and exhibits offered into evidence in this case have been submitted by both plaintiffs and defendants alike in their proposed findings of fact for the court. The crucial factual issues in this case are, of course, disputed. These, however, involve the factual inferences—regarding such things as motivation and reasonableness—to be drawn from the largely undisputed objective facts in the controversy. Accordingly, the court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Plaintiffs are Dignity-New York and several of its members. (Undisputed Facts #1.) Dignity-New York is the local chapter of an international organization of gay and lesbian Roman Catholics, (Undisputed Facts, #2; Tr. 604), whose 320 person local membership includes lay people as well as current and former priests, seminarians, and religious brothers. (Tr. 604.) Defendants in this case are the New York City Police Department, Police Commissioner Benjamin Ward and Mayor Edward I. Koch.

A brief overview of the witnesses testifying during the trial in this case will be helpful in following the court's extensive factual findings, as well as in giving an overview of the major players in the controversy. J. Matthew Foreman and Timothy Coughlin are both members of Dignity and also both serve on its Board of Directors. (Tr. 4, 602–03.) Both individuals have participated at past Gay Pride Parades. Foreman is also active in the organization of the Gay Pride Parade generally, serving as a member of the Board of Directors of Heritage of Pride, Inc., (the official organizers of the annual June celebration), and is co-coordinator of the Gay Pride Parade for 1986 and 1987. (Tr. 3–4.)

The other witnesses in this case include various officials in the New York City Police Department, as well as the organizers of the main anti-gay counterdemonstration group, and a Catholic Church official. Gerard J. Kerins is an Assistant Chief of Police of the City of New York. Since February 1984, Kerins has been the commanding officer of Patrol Borough, Manhattan South, which encompasses all of Manhattan south of 59th Street and includes St. Patrick's Cathedral. Chief Kerins has responsibility,

---

1. The late date of this trial was unfortunate but unavoidable. Plaintiffs did not amend their complaint by adding a request for relief as to the 1986 Parade until early January of this year because up to that time there appeared to be a possibility that Dignity's request might be granted by the Police Department without court order. Until about December of 1985, defendants had represented that the Police Department was still considering whether or not to grant Dignity access to the Cathedral sidewalk for the 1986 Gay Pride Parade. Thus, the possibility existed until about six months ago that plaintiffs' claim would be mooted by favorable police action.

The court was unable to schedule the trial earlier than mid-May due to a five week, multi-defendant organized crime trial it had been presiding over since April. The court began the trial in this civil case immediately at the close of the criminal trial upon the commencement of jury deliberations therein.

The extensive discovery performed in the present case, which gave rise to several serious discovery disputes, made it impossible to set a trial earlier in the spring. Indeed, the joint pre-trial order was not submitted until about April 15. In addition, the parties's exceptionally voluminous proposed findings of fact were due and submitted to the court last Friday, June 6, 1986.

among other things, for police operations in connection with parades, demonstrations and special events occurring within Manhattan Borough South, including the Gay Pride Parade. (Undisputed Facts ## 7, 8, 9; Tr. 333, 446.) Chief Kerins was the successor to Assistant Chief of Police Milton Schwartz who served as commanding officer of Manhattan Borough South from October 1979 to July, 1983. (Tr. 892–93.)

The lesser ranking police personnel called upon to testify were Lieutenant David Tarantino, Lieutenant Joseph Congelosi, and Captain Louis Anemone. Lt. Tarantino is currently assigned to the Manhattan Borough South police unit and served from 1981 to May 1985 as commanding officer of the operations unit where his responsibilities included police staffing and planning for parades and demonstrations. (Undisputed Facts # 10.) As head of the operations unit during this time, Lt. Tarantino was responsible for intelligence gathering with regard to potential problems at the Gay Pride Parade, and was present at all Gay Pride Parades from 1981 to 1984. (Undisputed Facts ## 52, 58; Tr. 133.) Lt. Congelosi succeeded Tarantino as commanding officer of the Manhattan Borough South operations unit in May 1985 and currently continues in this position. Prior to 1985 Congelosi was assigned to the same unit as a sergeant. (Undisputed Facts, # 11; Tr. 236–37.) In these capacities Congelosi has been present at Gay Pride Parades since 1983. Finally, Captain Anemone of the Manhattan Borough North police unit, who handled police security at an October 1985 demonstration by members of the Catholic Church protesting the showing of an allegedly sacrilegious film, testified with regard to that demonstration and its repercussions on the 1986 Gay Pride Parade. (Tr. 644–61.)

Witness Andrew McCauley, a private citizen residing in the St. Patrick's Cathedral neighborhood (Tr. 502.), is a founder and vice president of the Committee for the Defense of St. Patrick's, a group that has organized counterdemonstrations at past Gay Pride Parades, and which is active as well in the organizing effort for this year's Gay Pride Parade counterdemonstration. (Undisputed Facts # 34; Tr. 506, 514, 528, 538–39.) Herbert McKay is President and co-founder with Mr. McCauley of the Committee for the Defense of St. Patrick's. (Undisputed Facts # 33; Tr. 502.)

The final key witness in this case was Monsignor James F. Rigney. Msgr. Rigney has been Rector of St. Patrick's Cathedral since 1970, and as such is responsible for the care and general operation of the building. In particular, Rigney represents the Church in public dealings regarding the Gay Pride Parade as it affects the Cathedral. (Undisputed Facts # 28; Tr. 48).

The First Amendment controversy presented by this lawsuit has as its backdrop the Gay Pride Parade which has occurred annually in New York City since 1970 on the last Sunday in June. (Undisputed Facts # 12, 14.) This year's Parade, for which a police permit has already been granted, (Undisputed Facts # 102), is scheduled to occur on June 29, 1986. (Undisputed Facts # 101.) The Gay Pride Parade gives expression to the political, social, and religious views of the gay community and functions as well simply as a celebration of gay pride. (Undisputed Facts # 16.) Since at least 1976 the Parade route has followed Fifth Avenue south from Central Park to Greenwich Village, passing on its way in front of St. Patrick's Cathedral, which is located on the east side of Fifth Avenue between 51st and 50th Streets. (Undisputed Facts # 19, 21.) For the 1986 Parade, the Police Department expects about 20,000 marchers. (Tr. 334.) The Parade, besides its individual marchers, is comprised of many different gay groups from the region. Dignity participates as one such component of the Parade. (See Plaintiffs' Exhibits (hereinafter "PX") 184, 187, 189, 194, 195, 197, 202.)

During Gay Pride Parades from 1976 to 1982, the general public, as well as members of Dignity, and other individuals and groups participating in the parade, had access to the public sidewalk and Church owned steps in front of the Cathedral.

(Undisputed Facts # 41, 45, 53; Tr. 898–99.) The Cathedral is the seat of the Roman Catholic Archdiocese of New York (Undisputed Facts # 22), and to many persons, including both members of Dignity and opponents of the Gay Pride Parade, it functions as a special symbol of the American Catholic Church.

In the pre–1983 period when the Church sidewalk and steps were open to the public, Dignity members conducted prayer services, sang hymns and engaged in other peaceful activities there. (Undisputed Facts ## 41, 45, 53.) Dignity has always been completely peaceful and nonviolent. (Tr. 5–6; 51, 123; 231; 355; see also Defendants' First Amended Answer, Para. 17(d), 17(e); PX 1, pp. 43–46; 56–58.) The police do not now believe that Dignity would do anything to harm the Cathedral. (Tr. 360.)

By demonstrating on the sidewalk area fronting the Cathedral as the Parade passed by, Dignity sought to convey symbolically its love for the Church and its members' sense of themselves as integral parts of the Church's spiritual body. Dignity sought to communicate its belief that, notwithstanding the opposition of the institutional Church and its officials, Catholic gays need not choose between their homosexuality and their religion. Dignity also wished to convey its conviction that God's love and understanding extends to all people, regardless of their sexual orientation, and regardless of the official position of the Roman Catholic hierarchy. Underlying Dignity's wish to position itself in the area before the facade of the Cathedral, is the group's theological position that the Church is the people of God, rather than its mere institutions, buildings and leaders. (Tr. 605–09; 14–15). The audience Dignity is trying to reach includes all other marchers in the Parade, especially Catholic or ex-Catholic ones, as well as Parade spectators in the Cathedral area. (Tr. 605–06.).

In those years prior to 1983 when Dignity was allowed on the sidewalk and steps of the Cathedral during the parade, there were no problems or confrontations between Dignity members, or other gay demonstrators, and people entering or leaving the Cathedral. (Tr. 50; Undisputed Facts # 42.) As to the progress of the Parade, itself, Dignity's presence on the sidewalk interferes in no way. (Tr. 474.) Indeed, Dignity's presence on the sidewalk in front of the Cathedral actually helps keep the Parade moving along, since the marchers, being sympathetic to Dignity generally, are less inclined to stop in front of the Cathedral to express their hostile sentiments while Dignity is there. Since Dignity was barred from this sidewalk area in 1983, it has been harder to keep the Parade moving along and without gaps. (Tr. 11–13.)

Of the other pro-gay groups and individuals demonstrating on the steps and sidewalk in front of St. Patrick's in the years prior to 1983, as well as marching past it, several were openly hostile to the Catholic Church and its teachings. Expressions of this hostility took the form, among other things, of satirical chants placing into question the sexual orientation of prominent Church hierarchy, and costumed figures mocking nuns, the Bible, and the crucifixion. (Tr. 506–07, 511, 517–18, 565, 581, 584, 595.) During at least one parade, the North American Man-Boy Love Association, a group that advocates pedophilia and is thus, not surprisingly, particularly disturbing to opponents of homosexuality, distributed leaflets on the sidewalk in front of the Cathedral. (Tr. 509, 513, 564, 572.) Officials and parishioners of St. Patricks were generally not pleased with the presence of pro-gay groups, including Dignity, in front of the Cathedral during the Parade. (Tr. 122–23, 125–26.) However, although the Church would have been within its rights to request that the church steps, as private property, be kept clear, it refrained from making any such official request because of its fear of the bad publicity that might result. (Tr. 75, 109.)

Since 1983 Dignity has unsuccessfully requested that the City allow it, specifically, to hold a demonstration on the sidewalk during the Parade. Dignity's application to use the Cathedral sidewalk during the 1986

Parade has the endorsement of the Parade's organizers, Heritage of Pride, Inc., who have made their support official through a resolution of the Board of Directors. (Tr. 12; PX 202.)

Beginning in 1983, the Police Department barred all access to the steps and sidewalk of St. Patrick's Cathedral during the Gay Pride Parade. This so-called "freeze" applies to demonstrators, counterdemonstrators, and pedestrians alike. The initial 1983 decision to freeze the sidewalk was taken by then Assistant Chief Schwartz, as a reaction to the newly organized counterdemonstrators from the Committee in Defense of St. Patrick's, with whom the Department had met, and from whom the police allegedly feared violence. (Tr. 895–96, 924, 935–36.) This freezing policy has continued to the present for each Gay Pride Parade.

*Gay Pride Parades from 1983 to 1986*

The crux of defendants' purported justification in this case for closing, or "freezing," the St. Patrick's sidewalk during Gay Pride Parades, is the potential for violence by anti-gay counterdemonstrators. Since at least the 1981 Parade, a varying number of persons who opposed the Parade and who have at times conducted counterdemonstrations, have been present in the vicinity of St. Patrick's Cathedral. (Undisputed Facts # 30.) Recognizable counterdemonstrators have, however, never numbered many more than a hundred or so. (See *infra.*) Counterdemonstration organizers contend that individual members of the following groups, among others, have appeared at various Gay Pride Parades in the past: the Knights of Columbus, the Ancient Order of Hibernians, the Holy Name Society, the Catholic War Veterans, a group of Orthodox Jews, and a group known as the "Baysiders," famous for their devotion to the Rosary. (Undisputed Facts # 32; Tr. 525, 547–48.) These organizations are established groups in the community and have no history or agenda of violence. (Tr. 181, 199.) Many of the Catholic counterdemonstrators treasure the Cathedral as a symbol of their Catholic

faith, and view the presence of self-acknowledged gays on its steps and sidewalk to be a "desecration." Accordingly, they oppose Dignity's, as well as other gay groups', presence in the area immediately fronting the church during the Parade. (Undisputed Facts # 107, 110, 111, 113; Tr. 454–55, 476, 508–09, 518–19, 566.) Indeed, a major objective of some of the counterdemonstrators is to keep Dignity and other gay groups off the steps and sidewalk of the Cathedral during the Gay Pride Parade. (Undisputed Facts, # 109; Tr. 413; 567–568).

Two of the main representatives of the Gay Pride Parade counterdemonstrators, generally, have been Andrew McCauley and Herbert McKay, who together in 1982 formed the Committee for the Defense of St. Patrick's. (Undisputed Facts ## 36, 39, Tr. 367–68, 502.) The sole activity of the Committee is to encourage and organize counterdemonstrations at the Gay Pride Parade in St. Patrick's vicinity. (Tr. 345, 506–08.) The Committee has four officers, including Mr. McKay who is President, and Mr. McCauley, who is Vice President. (Undisputed facts ## 33, 34, 37). Its letterhead lists an approximately 30–member Advisory Board, (PX 37), most of whom, however, have never played any active role in the Committee's activities, much less participated as counterdemonstrators at St. Patrick's. (Tr. 505.) In fact, the basic function of the Advisory Board, most of whom Mr. McCauley conceded he has not spoken to "in years," is to have its members' names appear on the Committee letterhead. (Tr. 504–05.)

The Committee for the Defense of St. Patrick's traces its origins to the 1980 Gay Pride Parade, reports of which provoked Mr. McCauley's interest and ire. (Tr. 506–07.) Observing it himself in 1981 and 1982 and thereafter, McCauley was especially outraged by the graphic irreverence and "Catholic-baiting" he perceived in such behavior as chants implying the Pope was gay, trash cans labelled "Bible depositories," and someone dressed as a nun with a pig's face and wearing a badge saying

"child molester." (Tr. 506–07, 517.) McCauley was also particularly upset by the fact that the gay demonstrators had staked themselves out on the steps of the Cathedral, the physical property of the Church. (Tr. 511.) To prevent such "desecrations" and "attacks" on the Cathedral during future Gay Pride Parades, and to safeguard it from being used to "glorify sexual depravity and perversion," or as a stage for "sacrilege" and "blasphemy," McCauley together with his friend McKay, eventually formed the Committee for the Defense of St. Patrick's. (Undisputed Facts # 35; Tr. 506–08; 562–68.)

While the most violent reactions of McCauley and McKay (and the ones that came up initially and most repeatedly in their testimony) were to the dramatically anti-Catholic histrionics of the non-Dignity demonstrators, (See Tr. 508–11, 513, 517–18), they also find Dignity itself particularly disturbing, and consider its invocation of Catholic symbols and traditions to be "sacrilegious." (Tr. 512, 567–70, 572–73.) Moreover, while the main focus of the Committee has been on the steps of the Cathedral, i.e., to prevent the "takeover of Cathedral property," (Tr. 511), the Committee clearly objects to the presence of Dignity and other gay groups on the Cathedral sidewalk. (Tr. 511–513.) In fact, keeping Dignity and other gay groups off the sidewalk is one of the group's main purposes, and as long as Dignity or other such groups are not there, the Committee, itself, has no interest in demonstrating on the Cathedral sidewalk. (Tr. 519–20, 573–75, 578, 413.)

Again this year the police intend to freeze the sidewalk in front of St. Patrick's to all persons, including plaintiffs, during the Parade. The Police Department believes that the mere physical presence of Dignity on the sidewalk in front of the Cathedral would be construed by some as a symbolic desecration of the Cathedral and would thus increase the possibility of violence from counterdemonstrators. (Tr. 363–64, 366–67, 373, 376, 413, 454–55; 895–96, 901, 935.)

The sole issue before the court is whether the aforementioned police freeze, as applied to Dignity during the 1986 Parade, can pass constitutional muster. This determination, however, depends largely on the credibility and reasonableness of putative police fears of violence should Dignity be granted access to the sidewalk this year. In order to assess the credibility and reasonableness of these concerns it is useful to survey the history of the Parade, particularly as regards counterdemonstration activity, but also as it may shed light on any other police motivations in instituting the freeze.

In 1981, as in previous years, the sidewalk and the steps in front of St. Patrick's Cathedral were left open to all demonstrators, including Dignity, for the duration of the Gay Pride Parade. (Undisputed Facts ## 40, 41, 45; Tr. 898–99.) The police designated no separate areas for counterdemonstrators and, in fact, there were no organized counterdemonstration groups at the 1981 Parade. (Undisputed Facts ## 46, 47.) During that Parade, however, two minor incidents occurred which were targeted at the use of the Cathedral steps by gay demonstrators. (Undisputed Facts # 48; Tr. 350, 135.)

Andrew McCauley was arrested on the steps of the Cathedral for striking the Parade's Grand Marshal as he attempted to lay flowers on the Cathedral steps. Neither Parade participants nor Dignity members incited this incident. McCauley was removed from the steps, held until the Parade ended, and was then issued a summons and released. (Undisputed Facts # 49.) McCauley, who is a middle-aged man, reported that he did not like getting arrested and that he intended in his future counterdemonstrating activities to avoid such scrapes. (Tr. 531.)

Herbert McKay was also arrested during the 1981 Parade for interfering with marchers who were having their picture taken on the steps of the Cathedral with a Dignity banner. Again, neither Parade participants nor Dignity members incited this incident. McKay was removed from

the steps by the police, held until the Parade was over, and then issued a summons and released. (Undisputed Facts # 50.)

In 1982, despite the two incidents at the 1981 Parade, Dignity along with other demonstrators again had access to the sidewalk and steps in front of St. Patrick's Cathedral. (Undisputed Facts # 53; Tr. 898–99.) Moreover, within the Police Department prior to the 1982 Parade there had been no discussion about whether to restrict demonstrators' access to the sidewalk or steps. Approximately 50 police officers were assigned to the Cathedral area. (Undisputed facts ## 54, 55.) Apart from barriers abutting the east side of Fifth Avenue to separate the sidewalk from the line of march, no special barriers were placed along the sidewalk or steps fronting the Cathedral. (PX 56.)

According to the police estimate, only about 50 counterdemonstrators attended the 1982 Parade. (PX 1, p. 140 (Kerins affidavit, para. 16.) Although both McCauley and McKay were present that year, the Parade saw no incidents of violence. (Undisputed Facts # 56; PX 56; Tr. 582–83, 530–32.)

The year 1983 is, of course, of special interest in this case as the year of the initial police decision to freeze the St. Patrick's sidewalk during the Gay Pride Parade. (Undisputed Facts # 65; Tr. 901.) The freeze prevented Dignity from assembling as it wished on the steps and sidewalk in front of the Cathedral to conduct a peaceful religious service. (Undisputed Facts # 64.) The basis for then Assistant Chief Schwartz's decision was the potential for violence between pro-gay demonstrators, including Dignity, and "anti-marchers" such as the Catholic War Veterans. (Undisputed Facts # 66; Tr. 349, 901–02.) The Police Department's alleged concern for violence was also significantly informed by its anticipation of the possibly very large numbers of counterdemonstrators (Tr. 139; 897–98, 902) that had been indicated to the police by counterdemonstration organizers.

Specifically, Assistant Chief Schwartz, the then commanding officer of the area, and Lt. Tarantino had held an apparently routine meeting at the counterdemonstrators' request with McCauley and McKay, among others, in Spring of 1983 to discuss counterdemonstration plans for that year's Gay Pride Parade. (Undisputed Facts # 72; Tr. 930, 933; 137–38.) At that meeting, according to police testimony, either McKay or McCauley had indicated their expectation that 25,000 counterdemonstrators would show up at the Parade. (Tr. 138; PX 1, pp 197–210.) According to McCauley, however, he had only told police that because this was his first year of organizing, he was quite unsure about the crowd he could attract and thus was reluctant to give the Police any estimate of how many counterdemonstrators there might be. Later, in a telephone conversation, McCauley reported, he reluctantly proffered the number 1,000, but only when police insisted. (Tr. 522–23.)

Prior to the 1983 Parade a second significant police planning meeting took place. In years prior to 1983, St. Patrick's Cathedral officials were always attentive to the Gay Pride Parade and to the fact that pro-gay demonstrators were occupying the sidewalk and the steps of the church. (Tr. 49–50, 62.) Though church members had registered complaints from time to time—for example, Msgr. Rigney, the Rector of the Cathedral, had had several meetings with Mr. McKay, during one of which McKay, accompanied by a police department acquaintance, had expressed his wish that the Church take a less passive posture toward the gay marchers (Tr. 57–58)—church officials had decided not to take any controversial public action. As indicated by internal church memos, however, the 1983 police plan to freeze the St. Patrick's sidewalk was warmly received, (Tr. 68–70, 74–77; PX 124) and not entirely unanticipated.

The cooperative relationship which existed and had existed before is suggested by a memo sent by Rigney to the Cardinal describing a secret meeting he had had with Assistant Chief Schwartz and several other

police officers to discuss the 1983 Parade. Of this meeting Rigney reported to the Cardinal,

> They are emphatic that this is a police plan, does not require any request from the Archdiocese. It will be presented throughout as their initiative for the sake of public order. It seems to me that they said the very best we could hope for them to say.... They feel they are safe with the basis that it is a police intitiative to keep the peace and prevent violence. (PX 124.)

Because the meeting was held prior to the public announcement by the police of the decision to freeze the sidewalk, Assistant Chief Schwartz had specifically requested Msgr. Rigney to keep the meeting and the decision secret. Accordingly, a few days later when a Dignity leader telephoned Rigney to express his unhappiness that the area in front of St. Patrick's had been entirely closed to demonstrators, Rigney responded that he knew of no such plan. Rigney felt obliged, however, to report this call to the police by sending them a blind copy of a memo he had written describing it. (PX 125; Tr. 126–27.)

The 1983 Parade, itself, proceeded without violence. (Undisputed Facts # 70.) About 100 policemen were assigned to the Cathedral area for the 1983 Parade (Undisputed Facts # 71) and approximately 100 counterdemonstrators were actually on hand to protest. (Tr. 162, 347; PX 1, p. 140; PX 1, pp. 202–03.) An area for counterdemonstrators was designated on the sidewalk on the west side of Fifth Avenue between 49th and 50th Streets, directly abutting the line of march. Assistant Chief Schwartz had placed the counterdemonstrators directly along the line of march specifically so they could see that the Police Department had kept its promise not to allow gay groups on the sidewalk and steps in front of the Cathedral. (Tr. 914.) The west side of Fifth Avenue from 49th Street to 46th Street was also available as an overflow area for counterdemonstrators who never showed up. These areas were demarcated by wooden saw-

horses. (Undisputed Facts # 69; PX 66, 67; Tr. 534.) During the 1983 Parade the police encountered no problem with counterdemonstrators attempting to leave their appointed areas. (Tr. 143; 949–50.)

In 1984, the new Assistant Chief for Manhattan Borough South, Chief Kerins, again decided to freeze the Cathedral sidewalk. Kerins' basis for continuing the freeze was essentially the same which had led Chief Schwartz to intitiate the freeze in 1983, i.e., a purported risk of violence between the counterdemonstrators and gay groups seeking access to the sidewalk and Cathedral area. (Undisputed Facts # 77; Tr. 348, 351, 454.) Prior to the 1984 Parade, Kerins and Lt. Tarantino held meetings with representatives of counterdemonstration groups, including McKay and McCauley, to assess their plans for the upcoming event. (Undisputed Facts # 76). The counterdemonstrators again predicted large numbers. (Tr. 147.) Based on these discussions the Police Department anticipated that thousands of anti-gay individuals would attend the 1984 Parade. At this meeting in 1984—but prior to any investigation of the figures supplied by the counterdemonstrators (Tr. 150)—the Police Department announced to the counterdemonstrators that the sidewalk would again be frozen as in 1983, (Tr. 147, 150.)

Also prior to the 1984 Parade, the Police Department, through Lt. Tarantino, had initiated contact with Msgr. Rigney at St. Patrick's to discuss the as yet only projected sidewalk freeze. Tarantino asked Msgr. Rigney to schedule a church service during the hours of the Parade, explaining that this would make it "easier" for the police to "reply" to the gays who wished to demonstrate in front of the Cathedral. (Tr. 83–85.) Rigney was under the impression from this conversation that a municipal ordinance precluded demonstrations in front of churches or synagogues while religious services were being held. In response to the lieutenant's call (notwithstanding Rigney's and Tarantino's implausible testimony that the suggestion was merely a "joke"), the monsignor passed the idea on

to the then-acting Bishop of the Cathedral. (Bishop O'Keefe acted as leader of the diocese in the interim period between Cardinal Cooke's death and the appointment of Cardinal O'Connor.) The reply from the Bishop was a "wish" that a service be scheduled during the Parade. (PX 127.) Despite incoming Cardinal O'Connor's interest in counterdemonstration efforts,[2] however, no such afternoon service was ever in fact scheduled to coincide with the parade.

Approximately 20,000 gay marchers in all participated in the 1984 Gay Pride Parade. (Tr. 335 (Kerins); 636–37.) (Although Chief Kerins, in his Affidavit in Opposition to the Motion for Preliminary Injunction filed prior to last year's hearing, stated that there had been an estimated 75,000 marchers and that this number was the official police estimate, (PX 1, p. 241; Tr. 337), these early estimates were obviously incorrect.) As for counterdemonstrators, only 75 to 100 actually appeared at the 1984 Parade. (Undisputed Facts # 81, PX 42.)

During the 1984 Parade the counterdemonstration area was changed to an area diagonally southwest across the street from St. Patrick's, about 150 feet from the center of the Cathedral sidewalk. (See Tr. 444.) This area was set back into 50th Street about 10 feet behind the building line. (Undisputed Facts ## 78, 79). Chief Kerins designated no area for counterdemonstrator overflow. (Tr. 345–46.) In all, approximately one hundred policemen were assigned to the Cathedral area in 1984. (Undisputed Facts # 83.)

According to Lt. Tarantino, who was generally present in the Cathedral area during the 1984 Parade, (Tr. 151–152), four or five counterdemonstrators may have strayed from the counterdemonstration area onto the adjacent sidewalk along the west side of Fifth Avenue. However, they returned to the official counterdemonstration area without any argument or violence when requested to by police. (Tr. 30–31, 153–54, 393–94, 441.) Even when they left the counterdemonstration area, it should be noted, these counterdemonstrators remained a significant distance from the line of march, separated from the avenue by a row of police officers and police sawhorses. (Undisputed Facts # 79.) Furthermore, apart from verbal requests to return to their designated area, the police, only a handful of whom were assigned to monitor the counterdemonstration area, did not find it necessary to make any special efforts to keep the counterdemonstrators within the assigned 50th Street space. (Tr. 30–31.)

In 1984 the police permitted Dignity, who was marching in the Parade, to stop the line of march for ten to fifteen minutes in order to conduct a religious service on Fifth Avenue in front of the Cathedral. During that service two Dignity members were permitted by the Police Department to step briefly off the avenue onto the Cathedral sidewalk and lay a wreath on the sidewalk. (Undisputed Facts # 84.) The counterdemonstrators made no attempt to stop or interfere with this ceremony or the wreathlaying while it was occurring. (Undisputed Facts # 85; Tr. 155, 369, 394–95.) In fact, during the entire 1984 Parade there were no incidents of violence from counterdemonstrators. (Undisputed Facts # 82; Tr. 31; 153–54).

Last year, in 1985, the Police Department again decided to freeze the sidewalk in front of St. Patrick's. (Undisputed Facts # 94.) The purported basis for the continuation of this policy was the same as that given in 1983 and 1984, i.e., the possibility of violence between counterdemonstrators and gay groups demonstrating on the Cathedral sidewalk during the Parade. (Undisputed Facts # 95; Tr. 349, 351–52, 454.) In Lt. Tarantino's judgment, at least, the potential for violence at the 1985 Parade was no different from what it had been at previous Gay Pride Parades during his tenure as head of the operations unit for Man-

2. Prior to his appointment as head of the New York Archdiocese, Cardinal O'Connor sent a letter received by Msgr. Rigney discussing counterdemonstration efforts and enclosing a flier which described such efforts as they affected the Cathedral. (Tr. 123.) The Cardinal's letter, however, has mysteriously disappeared from Church files. (Tr. 123.)

hattan Borough South from 1981–1984. (Tr. 166.) The police again grounded their fear of violence in the predictions of counterdemonstrators with whom they had met earlier in 1985. (See Undisputed Facts # 91.) McKay and/or McCauley had estimated that there would be "thousands" (Undisputed Facts # 120), or at least "large numbers" of counterdemonstrators present at the 1985 Parade, "several times" over the previous year's showing. (PX 20; Tr. 157–58, 173). Based on these discussions, Lt. Tarantino reported that he felt the potential existed for a counterdemonstration turnout of "thousands" at the 1985 Parade. (Tr. 164–165.)

Prior to the 1985 Parade plaintiffs brought this law suit and moved for a preliminary injunction forbidding the police from barring Dignity from the Cathedral sidewalk. After finding that police fears of violence were too speculative to reasonably support the restriction, the court ordered defendants to submit a plan for allowing Dignity onto the sidewalk during the Parade. (PX 1, pp. A472–73 (court's order of June 13, 1985).

Accordingly, the police department drew up a plan that would have allowed about fifty to one hundred Dignity members on the sidewalk directly in front of St. Patrick's in a barricaded pen area. The Dignity members who had been chosen to so demonstrate would gather prior to the Parade in an assembly area adjacent to the Cathedral on 51st Street. (Tr. 94–95, 396–99; PX 129; see also, Tr. 241–44, 491–95.). Inexplicably, on the day the proposed order was due, the court was not informed by defendants of the numbers which this plan entailed. At this point the court directed the police to allow a reasonable number of Dignity demonstrators on the sidewalk during a reasonable period of time during the Parade. (PX 1, pp. A498–99 (court's order of June 18, 1985).)

After the Court of Appeals vacated this court's order that Dignity must be allowed on the St. Patrick's sidewalk, the police proceeded with a demonstration plan for the area that was essentially identical to the one followed the previous year. As in 1984 a counterdemonstration area on 50th Street west of Fifth Avenue, set back ten feet from the building line, was designated. (Undisputed Facts # 96, 97.) No area was designated for counterdemonstrator overflow. (Tr. 345–46). In 1985 counterdemonstration areas were delineated by steel "French barricades" as well as by wooden sawhorses, the police department having just acquired a supply of the innovative French barricades. (Tr. 391, 394; PX 191.)

In the weeks preceding the 1985 Parade, the police had planned on a second counterdemonstration area at 47th Street patrolled by ten mounted police for a group of Hassidic Jews who had announced to the police their intention of blocking the Parade at this juncture. (Tr. 391–92.) When insufficient numbers of Hassidim turned out, however, to justify a separate counterdemonstration area, they were placed along with the other counterdemonstrators in the 50th Street location. (Tr. 25–26; 269; PX 191.) Moreover, the Hassidim never attempted to carry out their threatened blockade. (Undisputed Facts # 99.) Furthermore, during the 1985 Parade none of the counterdemonstrators left the designated area. (Tr. 391; 28.)

The 1985 Gay Pride Parade was generally uneventful. Fewer than 20,000 participants marched in it (Undisputed Facts # 88; Tr. 335) and of these only about 9,225 actually passed by the Cathedral. The remaining marchers joined the Parade farther south towards Greenwich Village and never came into the Cathedral area. (Tr. 339, 436; PX 84). The court finds that the Parade took approximately two hours to pass a single spot in 1985 (Undisputed Fact # 17). Although Chief Kerins testified that the Parade took approximately three hours to pass the Cathedral (Tr. 435), the Parade count performed by the police in 1985 (PX 84) indicates that the Parade reached the Cathedral at 1:10 PM and ended at 2:53 PM. The number of marchers who occupied a single block at any one time during the Parade varied from about 150 to 600. (Undisputed Facts # 18; Tr. 340–41).

The court finds that at most, 140 to 150 counterdemonstrators appeared at the 1985 Parade. (Tr. 19–25; PXs 184, 186, 190, 191). Although the police have stated that 250 counterdemonstrators appeared in 1985, none of the police officers who testified actually performed a count. (Tr. 341, 347, 268–69.) There is, therefore, no affirmative evidence to support the police figure of 250. Mr. Foreman who testified to a number of about 150 counterdemonstrators, explained that he had actually counted them, and described the method he used to do so. In any event, Police Department photographs of the 1985 Parade indicate that the 140–150 figure determined here by the court is, if anything, generous. The court notes that even were it to accept the 250 figure, this would in no way change the outcome of this case.

As in 1984, in 1985 one hundred officers were assigned to the Cathedral area. (Tr. 438; PX 102.) Two hundred fifty police officers were assigned to the area on Fifth Avenue between 52nd Street and 48th Street. (Tr. 438–39; PX 102.) Also, as in 1984, Dignity was permitted to conduct a brief religious service in front of St. Patrick's by stopping in its line of march for a short period and also laying a wreath on the Cathedral sidewalk. (Undisputed Facts # 92). During the 1985 Parade no incidents of violence took place. (Tr. 17; PX 205.) Indeed, the subsequent police report on the Parade documenting the lack of violence accordingly recommended a 15–20% reduction in the 1986 police detail. (PX 205.)

The Police Department expects in all approximately 20,000 people to march in the 1986 Parade. (Tr. 334.) The police also report they have no reason to expect any more marchers will actually pass the Cathedral in 1986 than in 1985, i.e., fewer than 10,000. (Tr. 339). For 1986 Chief Kerins again intends to freeze the sidewalk fronting St. Patrick's Cathedral based on his perception that there is a serious risk that counterdemonstrators might react violently to the presence of Dignity on the disputed sidewalk. (Undisputed Facts # 105; Tr. 351–54; 454–55.)

For the 1986 Parade, counterdemonstrator organizers McCauley and McKay have estimated a counterdemonstrator turnout of about 1,000. (Undisputed Facts # 106.) The court takes notice, of course, that at trial McCauley offered his "educated speculation" that perhaps two or three thousand counterdemonstrators might appear at the 1986 Parade. McCauley's revised estimate since his deposition, however, is due to the possibility that certain Hispanic demonstrators who had protested against the Gay Rights Bill at City Hall earlier this year, as well as certain demonstrators who had turned out in large numbers at Lincoln Center to protest the film "Hail Mary," might decide to join the Gay Parade counterdemonstrator group. (Tr. 528–29.) As discussed separately below, the court finds such speculation specious because the Hail Mary protest was entirely unrelated to homosexuality. To the extent that the so-called Hispanic group might increase the anti-gay count at this year's Parade, the court finds this to be essentially irrelevant to this case since it is gays and the Parade in general, rather than Dignity's use of the Cathedral sidewalk, which appear to incite this group's wrath.

*The Police Department Rationale for Freezing the St. Patrick's Sidewalk in 1986.*

As noted by Police Chief Kerins, public sidewalks are not closed by police during parades unless there is some particular reason to take such a measure. (Tr. 351.) The sole justification given by the Police Department for again closing the Cathedral sidewalk to Dignity in 1986 is the purported risk of violence from irate counterdemonstrators who would be specifically provoked by Dignity's presence on the sidewalk. (Tr. 360, 386–87; Tr. 285.) The police distinguish this special risk from the risk created by the general hostility between counterdemonstrators and Parade marchers in general. (Tr. 454–55.)

The court finds and concludes that the police plan denying Dignity access to the sidewalk in front of St. Patrick's is directly

related to the symbolic message that Dignity wishes to convey by demonstrating there, i.e., that there can be harmony between homosexuality and Catholicism. In arriving at this conclusion, the court necessarily rejects the police contention that the potential for uncontrollable violence from counterdemonstrators, or some standard and reasonable police practice, rather than police sensitivity to counterdemonstrator wishes and pressures, is the underlying reason for the sidewalk freeze.

The Police Department decision to remove gay demonstrators from the Cathedral sidewalk originally, and this year to deny Dignity permission to use the sidewalk, was made precisely to allay objections of anti-gay and anti-Dignity counterdemonstrators. (Tr. 386–87, 476; 895–96, 902, 908–09.) The Police Department believes that barring Dignity from the Cathedral sidewalk during the Parade would decrease the potential for violence by minimizing the pointedness of counterdemonstrator opposition. (Tr. 385–87.) The police concede that if counterdemonstrators did not consider Dignity's presence on the sidewalk a desecration of the Cathedral, there would be no reason for the freeze. (PX 218, pp. 166–67.) In determining whether Dignity's presence in a particular location amounts to a provocative desecration in the eyes of the counterdemonstrators, Chief Kerins, who mandated the freeze this year, relies not only on the statements of the counterdemonstrators, but also on his independent evaluation of the history of the Gay Rights Parade and his past experience with these counterdemonstrators. (Tr. 373–74, 377.)

The effect of the Police Department's decision to close off the St. Patrick's sidewalk during the Gay Pride Parade has been subtly to favor the religious views of the counterdemonstrators at the expense of Dignity's and to communicate the impression that the police are in fact siding with the counterdemonstrators. (Tr. 616–19, 10–11.) As communicated to Chief Schwartz by counterdemonstrators McKay and McCauley, when the decision to freeze the sidewalk was first taken in 1983, they felt they had won an important victory since their view and objectives had prevailed. (Undisputed Facts # 60; Tr. 578–79.) Counterdemonstrators have expressed their satisfaction with the continuation of the sidewalk freeze in later years including, they hope, this one, noting that simply keeping Dignity and other gay demonstrators off of the area in front of St. Patrick's has always been one of their major objectives. (PX 1, p. 205.)

The court specifically rejects defendants' arguments that its decision to keep Dignity from the Cathedral sidewalk is a content neutral product of standard police policy concerning controversial demonstrators. The court finds that the allegedly standard police practice of keeping antagonistic demonstrators out of sight and sound of each other is not really a standard practice at all, and in any case would not be violated by allowing Dignity on the Cathedral sidewalk. There appears to be no police document or manual describing such a "standard" police practice (see PX 213). There is no mention of it made in police training programs. Instead, this practice, which is obviously a sensible one in some situations, is not automatic but depends on the circumstances. (Tr. 417; See Tr. 913).

The Police Department can itself recall only five occasions when the allegedly standard practice of separating antagonistic groups has been put to use since January 1, 1980. Of these, two were police invocations of the "practice" during previous Gay Pride Parades. (PX 214.) On another of the five occasions, involving a demonstration at the Eighth Street Playhouse, anti-gay Orthodox Jews and pro-gay demonstrators were in fact positioned by the police within sight and sound of each other. (Undisputed Facts # 116; Tr. 419–20.) Disregarding the extremely vague testimony offered at trial about the use of this "standard practice" during presidential visits, (Tr. 418, 674) which in any case raise additional national security concerns clearly not present during the Gay Pride Parade, this leaves only two purported occasions since

1980 when this "standard" police policy was actually invoked.

Even were this court to accept defendants' contention that a "standard police policy" of separating antagonistic groups in fact exists, this policy would by no means require the exclusion of Dignity from the St. Patrick's sidewalk. Instead, the alleged policy could be satisfied merely by placing the counterdemonstrators a sufficient distance away from Dignity, something that would in fact be the case if Dignity were allowed on the sidewalk and the counterdemonstrators placed, as always, in their West 50th Street counterdemonstration area. Further undermining the allegation that a standard policy of the sort alleged here even exists, is the location in past Gay Pride Parades, as well as in the projected 1986 Parade, of the anti-gay counterdemonstrators in 50th Street well within sight and sound of the pro-gay marchers passing along the Parade route generally.

The police also contend that the decision to keep Dignity off the Cathedral sidewalk comports with another allegedly standard police practice. This is the practice of closing St. Patrick's sidewalk during certain other parades, for example, the annual St. Patrick's Day Parade. This argument is embarrassingly feeble since the sidewalk "freezing" during other parades occurs for reasons entirely different from those which prompt police to freeze the sidewalk during the Gay Pride Parade. During other parades the Cardinal and other Church hierarchy review the marchers from the steps of the Cathedral. There are no barriers separating or cutting off the sidewalk from the avenue, moreover, and parade participants are free to step out of their line of march in order to greet the Cardinal personally where he stands on the sidewalk.

It cannot be seriously contended that the policy of freezing the Cathedral sidewalk during certain other parades which are observed and blessed by the Cardinal from the Cathedral steps should help explain, as somehow "standard", the police practice of closing the sidewalk during the Gay Pride Parade.

Furthermore, as to the allegedly standard policy of freezing St. Patrick's sidewalk during other parades, Police Chief Kerins has conceded that even if a group hostile to the Cardinal's appearance in front of the Cathedral on the public sidewalk voiced some protest, he would not respond by freezing the sidewalk entirely. Instead, he would simply assign the hostile demonstration group a counterdemonstration area on 50th or 51st Street. (Tr. 421–22.)

The court also rejects the suggestion that a contributing factor in the decision to keep Dignity off the St. Patrick's Cathedral sidewalk is a standard police policy of keeping demonstrators away from the line of march. The police policy, if it indeed exists, would only reasonably apply to hostile demonstrators. Even as to hostile demonstrators, moreover, the police do not always implement this policy. This is evidenced by their decision in the 1983 Gay Pride Parade to place hostile counterdemonstrators directly along the Parade route. As to the presence of Dignity on the sidewalk, the police appear to have no concern that it will somehow interfere with the progress of the Parade. The mechanics of granting Dignity access to the St. Patrick's sidewalk would not require the opening of the police barriers along the Parade route. Dignity sidewalk demonstrators could easily enter and leave their assigned area from 51st Street, well away from both the marchers and counterdemonstrators.

The major police rationale for closing the sidewalk to Dignity and its members during the 1986 Gay Pride Parade is, of course, the stated concern of the police department that to allow Dignity on the sidewalk would substantially increase the risk of violence during the Parade. Neither the history of the Parade nor any of the factors which the police contend materially alter the counterdemonstration potential for this year's Parade, convince the

court that the police concern for violence is in any way credible or reasonable.

Naturally there is a *potential* for violence in any large demonstration involving controversial and emotional issues. Yet the Police Department has not produced any convincing evidence to show that its concern for violence in the Gay Pride Parade, were Dignity to be allowed on the Cathedral sidewalk, is any different from the possibility of violence inherent in any controversial public gathering. The hostility between gays and counterdemonstrators at the Parade, even that which might be provoked by the blatantly anti-Catholic manifestations of certain demonstrators not at all affiliated with Dignity, has historically been kept under control by the Police. (Tr. 169–70.) The court finds that the potential for violence from demonstrators, either individually or in groups, is highly speculative and, at any rate would be controllable by the police using routine good planning and procedures.

The various specific police concerns for violence in the 1986 Parade are drastically undermined by a clear-eyed survey of the Parade's counterdemonstration history. Other than the minor incidents involving McKay and McCauley individually at the 1981 Parade, there has been no evidence of violence in the history of the Parade. (Undisputed Facts ## 40, 41, 56, 70, 82, 99.)

Police suggestions that counterdemonstrators might attempt to leap police barriers on West 50th Street, and physically assault police officers, marchers, and pedestrians in order to reach Dignity, across the street and half a city block away, are not even vaguely substantiated by past Parade experience with anti-gay demonstrators. In the history of the Parade, no counterdemonstrator has breached the line of march. (Tr. 28, 143, 153–54, 391, 393–94, 441, 949–50.) The 1984 incident of "counterdemonstrators overrunning the barriers," described by Chief Kerins at trial, turns out upon closer examination to be not proved. Because the police that year had not informed them of the decision to allow Dignity its Fifth Avenue prayer service and wreath laying ceremony, (Undisputed Facts # 86), counterdemonstrators McKay and McCauley apparently spoke to members of the press outside the demonstration area, complaining that the police had failed to "level" with them. Then, after the last Parade group had passed the Cathedral, the two men visited with Lt. Tarantino to say they were upset about not having been told of the ceremony beforehand. (Undisputed Fact # 87.) Neither McKay nor McCauley nor any other counterdemonstrator ever attempted to interfere with Dignity's ceremony. (Tr. 369; Undisputed Facts # 85.)

The Police Department also points to the use of "provocative words" at prior Gay Pride Parades as an indication that a serious potential for violence exists this year. Provocative words, however, as well as such symbolic expressions of disdain by counterdemonstrators as the shaking of rosaries and the hoisting of crosses (Tr. 28), have been exchanged at every Gay Pride Parade in the past, yet have not led to violence. The Police Department lacks any reason, moreover, to think that such words and hostile emotions will cease or be much allayed if Dignity is kept from the Cathedral sidewalk. (Tr. 379.) The potential for violence from provocative words is something with which the police will have to deal regardless of whether the sidewalk is frozen.

To the knowledge of the Police Department, counterdemonstrators have not thrown objects at Parade participants or at Dignity members during prior Parades, even though they were close enough to do so. (Undisputed Facts # 126; Tr. 392.)

As to the possibility of large scale, uncontrollable riots at the Gay Pride Parade should Dignity be allowed on the Cathedral sidewalk, the court finds it has no reasonable basis. To begin with, the court must emphasize that the number of persons marching past the Cathedral last year and the year prior was in fact much, much lower than was originally thought at the time plaintiffs' preliminary injunction motion was considered by this court and the

Court of Appeals. While Commissioner Ward had estimated 75,000 marchers (PX 1, pp. 359–62), police figures from 1985 indicate that little over nine thousand Parade participants marched past St. Patrick's. (PX 84.)

Dignity members or other gay groups in the Gay Pride Parade themselves offer an insignificant potential for violence. The Police Department considers the history of a group's behavior in determining whether the group would be likely to incite violence. (Tr. 355.) Neither Dignity nor any other group in the Parade has ever instigated violence in the Parade. (Tr. 355.) Members of Dignity bear no particular hostile animus to the counterdemonstrators. (Tr. 32–33.) In the past Dignity has invited counterdemonstrators to meet with them independently of the Parade to discuss their differences. (Tr. 9–10.) Moreover, several members of Dignity are themselves also members of such organizations as the Catholic War Veterans to which some counterdemonstrators reportedly belong. (Tr. 32.)

Predictions of large scale riots are most significantly undermined by the nature of the counterdemonstrators, themselves, both those who have appeared in the past and those who might turn out this year. As Chief Kerins, himself, testified, the intention of most counterdemonstrators is to demonstrate peacefully. (Tr. 480.) Gay Pride counterdemonstrators—and the groups involved this year are significantly the same or similar—have always contacted the police before a demonstration. (Tr. 478.) The police understand this as an indication of the generally law-abiding, rather than violent or radical, nature of these individuals and their groups. (Tr. 480.) At each of the meetings counterdemonstrators have had with police prior to past Gay Pride Parades, the police received assurances that protest activities would be peaceful and police orders followed. (Tr. 521.)

Both Mr. McCauley and McKay, remarkably steadfast opponents of Dignity's access to the sidewalk and of the Gay Parade generally, testified that they would of course obey police orders at the Parade, and appeared genuinely startled and insulted when asked if they would consider resisting police commands by physical violence. (Tr. 520–21, 581–82, 588.) McCauley also testified that, from his experience with counterdemonstrators at past Gay Pride Parades, he had no reason to believe that if Dignity were on the Cathedral sidewalk during the 1986 Parade, counterdemonstrators would attempt to remove it or to interfere with its ceremony. (Tr. 522.) Chief Kerins, himself, testified that he did not believe there was any real possibility that counterdemonstration groups opposed to Dignity would attack police officers. (Tr. 410–11.) There is no evidence of counterdemonstrators having had, much less displayed, weapons at the Parade. (Tr. 169) The basically law-abiding nature of the counterdemonstrators as described even by the police is entirely consistent with the approximate age of the most of them, their largely suburban and outerborough residences, and their church-going and middle class character. (See PX 186; 191; 188; 210; Tr. 527; 537; 538; 704; 184; 224–225; 233; 704).

The diverse religious makeup of the anti-gay counterdemonstration groups at past Gay Pride Parades or anticipated to attend in 1986 further tends to belie the reasonableness of police fears that Dignity's presence on the Cathedral sidewalk in 1986 would significantly increase the risk of violence. The Police Department, itself, admits there is no reason to fear that the Orthodox Jewish counterdemonstrators who have consistently protested at the Parade, would be especially upset or even concerned by Dignity's presence on the sidewalk. (Tr. 375–76.) The same goes for Protestant counterdemonstrators. (*Id.*) The probable indifference of Protestants to Dignity's presence on the Cathedral sidewalk, as opposed to such counterdemonstrators' outrage at the Parade in general, is highly significant this year because one of the major new contingents of possible counterdemonstrators the police are focus-

ing on is a Hispanic group consisting mainly of evangelical Christians. (Tr. 529–30.)

Defendants explain their anticipation of violence this year, and thus their decision again in 1986 to close the St. Patrick's Cathedral sidewalk to Dignity, by the assertedly strong likelihood this year that a significantly larger number of counterdemonstrators than ever before will attend the Parade. It is not entirely clear that this contention is relevant to any justification for the police restriction at issue here, since to a large extent the numbers of counterdemonstrators who might be present in 1986 would not especially affect the potential for violence as it relates to Dignity, whether on the sidewalk or off. However, to the extent that the police contention of a large counterdemonstrator increase reasonably relates to the prudence of allowing Dignity on the Cathedral sidewalk, the court must assess this contention.

To begin with, the court notes that the history of predictions of counterdemonstrator attendance at Gay Pride Parades is one of striking and consistent exaggeration, both by the counterdemonstrators, themselves, and especially by the Police Department. The Police Department apparently relies in great measure upon the representations of the counterdemonstrators as to the number who will appear each year. (Tr. 281; 139–40; 897–98.) In determining the potential counterdemonstration figure, the Police Department has failed to ascertain or even consider the membership figures for the groups predicted to appear, or even how many from each have in fact showed up at past Parades. (Tr. 344–45.) Each year since 1983, "thousands" of counterdemonstrators have been predicted. Never have more than approximately 150 actually appeared.

With regard to both past and present predictions by counterdemonstrator organizers, the court finds that the Police Department's stated reliance on these figures to assess the risk of violence and thus keep Dignity off the St. Patrick's sidewalk, gives such individuals as McCauley and McKay every motive to exaggerate their predic-

tions. Another factor relied upon by the police in the past to predict large numbers of counterdemonstrators was a large mailing by the Committee for the Defense of St. Patrick's sent to the Knights of Columbus and others, urging attendance at the Parade in 1983. (Tr. 139; 928; see Tr. 524; Undisputed Facts 73.) As McCauley, himself, admitted, the results of this mailing were very disappointing, for only a few Knights of Columbus were rallied. (Tr. 524–25.)

The Police Department claims that it expects an exceptionally large counterdemonstrator turnout in 1986 based on certain new groups who have become interested in protesting homosexuality, as well as a general upsurge in anti-gay motivation among previously participating groups. The week before the trial in this case began, Lt. Tarantino was instructed by Chief Kerins to contact eight different groups to see if they were interested in counterdemonstrating at this year's Gay Pride Parade. (Tr. 427–28.) Tarantino contacted or attempted to contact the leaders of these groups by telephone from Wednesday, May 7, through Friday, May 9. The groups contacted were: the American Society for the Defense of Tradition, Family and Property; Keep the Faith; "Father Witkins's group"; the Baysiders; Rabbi Yehuda Levin's group; the Coalition to Preserve Family Life (also referred to as the "Hispanic group"); the Catholic League for Religious and Civil Liberties; and the state Knights of Columbus. (Tr. 184; PX 210.)

Some of these groups were contacted because they had appeared at past Parades, and some because they had been suggested by Mr. McCauley as potential demonstrators for 1986. Others were contacted merely because they had appeared at a demonstration at Lincoln Center a few months earlier to protest the film "Hail Mary," a sacrilegious treatment of the incarnation and the life of the Virgin Mary, having nothing to do with homosexuality. (Tr. 427–29, 462–64, 481–82; 679–80.)

Only one of the groups contacted, Rabbi Levin's group, indicated a definite intention

to counterdemonstrate at the 1986 Gay Pride Parade. Rabbi Levin stated that his group would demonstrate in about the same numbers as in 1985. (PX 210; Tr. 221–22.) Of the other groups on his list, Lt. Tarantino was unable to contact two (the Knights of Columbus and the Baysiders), and two others reported that they would not counterdemonstrate (Father Witkins's group and Keep the Faith). The remaining two groups, the "Hispanic group," and the Catholic League for Religious Rights, responded that they had not decided whether to attend the Parade, but that if they did decide to demonstrate they might be able to turn out nearly 10,000 each. (Tr. 185–86.)

None of the groups contacted by Lt. Tarantino indicated any particular desire to demonstrate in the Cathedral area even if they do decide to demonstrate. (Tr. 205, 212). Moreover, of the eight groups, only Rabbi Levin's, the Baysiders, and some members of the Knights of Columbus have ever demonstrated at the Parade before. (*See* Undisputed Facts # 32; Tr. 212.)

With regard to the investigation by Lt. Tarantino described above, the court finds a certain appearance of impropriety. Although Chief Kerins claimed that Mr. McCauley had identified the groups appearing at "Hail Mary" as possible counterdemonstrators, McCauley recalls no such conversation with Police Department officials prior to the time Lt. Tarantino contacted him the week before trial. (Tr. 537–39.) Moreover, the Police Department contacted the leader of one group, Fr. Witkins, with whom McCauley had never spoken. (*Compare* Tr. 430 and PX 210 with Tr. 536.) The court finds that the unusual police procedure of initiating contact with groups that had no history of appearing at the Gay Pride Parade (see Tr. 515 (Keep the Faith)), and which the counterdemonstrators, themselves, had not yet contacted, calls defendants' good faith and motives into question. Moreover, though Lt. Tarantino was eager to touch base with these groups for the benefit of the court in this proceeding, (Tr. 197–8), he made no attempt in his conversations with their representatives to garner

information that might substantiate the bald predictions of potential counterdemonstrator turnout. (Tr. 200, 204–05, 208–09, 211–12.)

In predicting notably larger numbers of counterdemonstrators in 1986 than have ever appeared at past Gay Pride Parades, the police place particular emphasis on the potential attendance of the Baysiders and the Hispanic group. (Tr. 463, 483.) The Baysiders, however, have already been present at past Parades, at least to the extent they were able to muster participants. (Tr. 526.) The Hispanic group, which appeared among a larger group of 2,000 demonstrators protesting the signing of a Gay Rights Bill at City Hall earlier this year (Tr. 529–30) are, as mentioned before, mostly Protestant. There is no evidence that even if this group appeared in large numbers at the 1986 Parade, it would be directing its opposition to Dignity as opposed to the Parade in general, nor that it would be any more offended by Dignity's presence on the Cathedral sidewalk than by the entire Parade. A flier distributed by the Hispanic group at the City Hall demonstration inviting people to demonstrate at the 1986 Gay Pride Parade, was directed not at Dignity, but at the Parade as a whole, and its band of "100,000 militant homosexuals." (DX A.) (Tr. 486–89.) The great store placed by the police in this random leafleting of pedestrians seems unfounded in light of McCauley's own prior disappointment with the results of his targeted mailing to hundreds of potential counterdemonstrators. (See Tr. 524–25.)

Other considerations offered by the police both this year and in the past to substantiate their belief that Dignity's presence on the St. Patrick's sidewalk would significantly aggravate the risk of violence from counterdemonstrators, do not actually relate to Dignity or its use of the sidewalk, but rather to anti-gay, anti-Parade hostility generally. These considerations do not create any greater potential for violence at the 1986 Parade than they or their counterparts created in past Parades. For example, the fact that lawsuits were brought in

1983 by counterdemonstration groups seeking to enjoin the entire Gay Pride Parade (*see* PX 1, p. 140; Tr. 361–62) offers little indication of the potential for violence in 1986 due to Dignity's presence on the Cathedral sidewalk.

The public controversy attending the passage of the New York City Gay Rights Bill this year also offers little basis for predicting any special risk of violence during this year's Parade, much less any risk that would be aggravated by granting Dignity access to the Cathedral sidewalk. The question of gay rights has been a public issue in New York for at least 17 years. (Undisputed Facts # 121; Tr. 382.) The Roman Catholic Archdiocese of New York has publicly spoken out against gay rights since at least 1980. (Undisputed Facts # 122; Tr. 7–8.) Moreover, prior to the 1985 Parade, it should be recalled, a perhaps even more controversial public issue pitting the Catholic Church against gays surfaced in the City's proposed regulation requiring Church social service agencies to hire gay employees or else lose public funding. See *Olivieri v. Ward*, 766 F.2d 690, 693 (2d Cir.1985). In any event, to the extent that controversial issues in the public spotlight, such as the Gay Rights Bill or AIDS, would heighten animosity between counterdemonstrators and gay groups, they will do so in the context of the entire Gay Pride Parade. Thus, whatever potential for violence they engender must be dealt with by the police in any case, regardless of whether the sidewalk is frozen to Dignity.

Most impressive to the court in concluding that any large scale threat of violence at the 1986 and other Gay Pride Parades cannot reasonably be related to whether or not Dignity is granted access to the Cathedral sidewalk, is the testimony of chief counterdemonstrators McCauley and McKay. When pressed, both men stated their indignation at Dignity, but the initial and most vociferous reactions of the two men were directed at the Parade generally, and especially at the grossly irreverent floats and signs in no way associated with plaintiffs, (Tr. 619), for example, the crucifix in a trash can, the nun with a pig's face, and the garbage "depository" for Bibles. (Tr. 506–07, 517–18; 581, 619.) Moreover, although McCauley, McKay and other counterdemonstrators appear to have been deeply disturbed by these displays, they have never attempted to remove them from the Parade. (Tr. 517–518; 565.)

Finally, to justify their challenged restriction this year on Dignity's use of the Cathedral sidewalk, the Police have pointed to several recent demonstrations concerning gay issues, or else involving Catholic groups who might conceivably be interested in protesting at the Gay Pride Parade. The court concludes that analogy to these other demonstrations is of limited value since there is no evidence that any of the groups involved in them would be particularly provoked by Dignity's use of the Cathedral sidewalk, the symbolic act which the police argue is especially likely to trigger violence.

The Police Department, for example, offered evidence of demonstrations in the vicinity of City Hall earlier this year to protest the Gay Rights Bill, as indicative of the increased possibility of violence should Dignity be granted access to the Cathedral sidewalk. (Tr. 342–43; 461–63; 186). This City Hall demonstration, however, protested homosexuality and gay civil rights generally. Furthermore, it involved no violent incidents. (Tr. 189.)

The police place particular emphasis on the Lincoln Center "Hail Mary" demonstration occurring in October 1985. They contend that this event is strong evidence of the potential for vast numbers of counterdemonstrators at this year's Parade. They point to it as well as support for the proposition that even the most mild and suburban of crowds can turn ugly without warning. As the court has already noted, the relevance of the "Hail Mary" demonstration is somewhat strained since the movie in question had nothing to do with gays or gay rights. (Tr. 679–80; 482; 540.) The court simply cannot conclude that the substantial turnout of Catholics at a demon-

stration to protest a film that they believed contained a sacrilegious portrait of the Virgin Mary (see Tr. 462–3, 341–343) can be logically used to predict counterdemonstrator turnout at the Gay Pride Parade. The court, however, will weigh this event as evidence of how a supposedly peaceful demonstration can get out of control—a risk that will, of course, always exist where any emotional and controversial subject is at issue.

The "Hail Mary" demonstration occurred in the side street adjacent to the small plaza in front of Alice Tully Hall and was attended by Catholics objecting to the film's blasphemous treatment of the Virgin Birth. The group had been largely organized by the leader of the Catholic League for Religious and Civil Liberties. A contingent of the "Baysiders" group also appeared. These groups had both been canvassed to counterdemonstrate at the Gay Pride Parade but as yet remain undecided. Many of the demonstrators at the "Hail Mary" demonstration had come in buses from Rockland County. Captain Anemone, who had overall responsibility for supervising the demonstration, even testified that he recognized a few of his fellow parishioners. (Tr. 704.) Although Captain Anemone testified repeatedly that he considered the "Hail Mary" incident to be a violent situation, no injuries occurred and no arrests were made, nor did anyone request that arrests be made. (Tr. 687–88, 709–10.) Captain Anemone's own official report of the incident states merely that the demonstrators "harassed and verbally abused theatregoers." (PX 212.)

A total of only twelve police officers had been assigned to cover the "Hail Mary" demonstration, (Tr. 648), and only wooden sawhorse barriers were used to designate the demonstration area. (See Tr. 688–89.) By 8:00 PM the "Hail Mary" protesters had grown to perhaps 5,000. Many of the later arrivals came in busses that unloaded on the open side of the Tully Hall. Of these late arriving counterdemonstrators, about one hundred refused to enter the demonstration pen that had been established by the police on the side street, and instead remained in the Alice Tully Plaza. This resulted in hostilities, comprised of jeers and shoving, between these counterdemonstrators and people entering the theatre. Captain Anemone, however, did not call in for additional personnel until after 8:30 PM, when several protestors in the counterdemonstrator area moved aside the sawhorse barriers and also entered the plaza. (Tr. 683–90.)

Before additional help arrived the police officers set up additional barriers, creating a passageway through which theatergoers could pass into the building in an orderly fashion and without interference by the protesters. Captain Anemone, who was present at the demonstration the entire time, testified that he believed there were reports of punching and shoving between theatregoers and demonstrators at this time. As noted above, however, they resulted in no arrests, injuries or property damage. (Tr. 691–94.) The tentativeness of Captain Anemone's testimony regarding violence during the "Hail Mary" demonstration, together with the lack of arrests or injuries, lead this court to conclude that police reports of violence are highly exaggerated.

When the additional twelve officers plus a sergeant arrived at Lincoln Center some time after the sawhorse passageway for theatregoers was arranged, this made a total of twenty-five officers in all assigned to the "Hail Mary" demonstration. Judging from the controlled, albeit emotional, nature of the demonstration, this was clearly adequate police coverage for the crowd. Moreover, to the extent that the potential size and anger of the crowd had been underestimated and fewer police than was perhaps wise were originally assigned, Captain Anemone admitted he had been "imprudent" in assessing the situation. (Tr. 703.)

The court concludes that the other demonstrations described at trial as variously relevant to predictions of increased violence if Dignity is allowed to occupy the Cathedral sidewalk at this year's Gay Pride

Parade, do not in fact contribute to the rationality of the restriction. For example, at public hearings held at City Hall earlier this year on the proposed Gay Rights Bill, pro and anti-gay rights groups and individuals sat interspersed listening to testimony and rising to voice their views. Several hundred members of the public attended the hearings. Only one or two policemen were present in the council chamber during the meeting and security precautions at City Hall appear to have been unremarkable. No violence or other disruptive incidents occurred. (Tr. 620–24.)

At another event brought to the court's attention pro and anti-gay groups demonstrated at the Eighth Street Playhouse in Greenwich Village at a showing of gay films. The demonstrators were placed within sight and sound of each other by the police. Moreover, the anti-gay demonstrators at this event were members of the same Orthodox Jewish group whose people have already appeared at past Gay Pride Parades. Thus, the police are already acquainted with this group's quite manageable potential for turnout and violence. In any event, no incidents of violence occurred at the Eighth Street Playhouse demonstration. (Tr. 419–20; Undisputed Facts # 117.)

In concluding that police assertions of a potential for violence at this year's Gay Pride Parade are neither reasonable nor credible, the court has also considered the evidence of police resources employed in past Gay Pride Parades or otherwise reasonably available. In light of this evidence the court finds that even if the larger numbers of counterdemonstrators generously predicted for this year's Parade do materialize, it is extremely unlikely that the police will be unable to maintain order.

The New York City Police Department contains approximately 26,000 officers and is the largest police department in the country. (Tr. 400; 747; PX 1, p. 390.) In the 1985 Parade the Police Department deployed 1,876 police officers, as compared to 4,198 at the St. Patrick's Day Parade. (PX 39; Tr. 414.) To cover the Gay Pride Parade from 59th Street to Greenwich Village, (about 53 blocks), the police department used approximately 1,400 officers. To cover only fifteen blocks of the St. Patrick's Day Parade route, however, the police, perceiving a necessity, were able to deploy 850 officers. (Tr. 415–16.) Notwithstanding this discrepancy and the St. Patrick's Day Parade's known history of rowdiness, (Tr. 415–420), Chief Kerins testified that he thought the Gay Pride Parade presented a much greater potential for violence than the St. Patrick's Parade. (Tr. 414.) The court concludes from this testimony that police estimates of the special potential for violence at the Gay Pride Parade are exaggerated and thus not entirely credible.

The court also notes various aspects of police equipment and expertise to support its conclusion that management of any potential hostility and violence at this year's Parade is well within police capacity. Some time prior to the 1985 Gay Pride Parade the New York City Police Department acquired "French barricades." These barricades are waist high metal barriers that lock together and have vertical metal slats to prevent people from climbing underneath them, as is possible with the traditional sawhorse barricades. (Undisputed Facts # 124; Tr. 391; PXs 187, 191, 193.) The police successfully used these barricades during the 1985 Gay Pride Parade to prevent any slippage of counterdemonstrators out of their assigned area on 50th Street. (See PXs 187, 191, 193.) While the police contend that one cannot rule out the possibility of a counterdemonstrator attempting to "climb over two sets of barriers, fight with police officers who are in front of him, and get across the street [to attack Dignity demonstrators]" (Tr. 265), the court does not understand the exact legal significance of this possibility. Although it is not theoretically impossible that a counterdemonstrator would attempt to breach the triple set of barriers lining Fifth Avenue and manned with a row of police, (see PXs 187, 191, 193), it is indeed never possible to rule out every distant potential for violence in human affairs.

(Tr. 400.) The mere theoretical possibility of violence cannot provide a basis for police restrictions on free speech.

Current police plans for the 1986 Gay Pride Parade belie defendants' assertions of belief that the atmosphere and counter-demonstration efforts surrounding this year's event differ in any significant way from previous years. This year Chief Kerins intends to assign approximately 1,400 police officers to the entire Parade, including the rally which takes place at the Parade's terminus in Greenwich Village. (Tr. 389.) As in past years, he intends to deploy approximately one hundred police officers in the immediate Cathedral area. (Tr. 390.)

Finally, in evaluating police protestations that the presence of Dignity on the St. Patrick's Cathedral sidewalk might well create a situation where it would be impossible for the police adequately to ensure public safety, the court turns its attention to a police plan developed last year in response to its own decision requiring Dignity's access to the Cathedral sidewalk. The police plan, which was never fully revealed to this court, see *supra* p. 23–24, and which was of course never put into effect because of the Second Circuit reversal of the preliminary decision in plaintiffs' favor, provided for the presence of about fifty to one hundred Dignity members on the sidewalk fronting St. Patrick's for the duration of the Gay Pride Parade. (Tr. 94–95, 396–99; PX 129.) A formation area for Dignity members who had been selected to demonstrate on the Cathedral sidewalk would have guarded against the group's infiltration by counterdemonstrators. Police officials were not concerned about possible counterdemonstrator infiltration were this plan effectuated. (Tr. 411; 244.) This plan to allow Dignity on the sidewalk included the assignment of 50 additional police officers to the Cathedral area, and kept another 50 in reserve nearby. No mounted police detail was added, however. (Tr. 243–44.)

Prior to the Court of Appeals' reversal of the decision granting Dignity access to the Cathedral sidewalk, Chief Kerins informed Msgr. Rigney of St. Patrick's that he would have sufficient police to ensure public safety. (PX 129; Tr. 94.) Yet when confronted at trial with the fact that they had managed to devise a plan to comply with the court's order last year, police testified awkwardly that they believed the plan inadequate to ensure public safety. (Tr. 266–67.) However, Lt. Congelosi, who so testified, had never requested the inclusion of additional police in the special plan. (Tr. 272.) Chief Kerins, who testified to his belief that the number of additional police officers included in the plan was sufficient if only to effectuate this court's order, also rather contradictorily said he did not believe the one hundred additional officers would have been adequate to maintain public order. (Tr. 499–500.) When asked to explain this peculiarity, Kerins told the court simply, "The closer you get to the flame the more sure that somebody is going to get burned, and we prefer not to have them [Dignity] on the sidewalk for that reason."

Considering the evidence of police manpower, the court finds that if Kerins had truly believed the plan to be inadequate he would have assigned additional officers. (See Tr. 501.) Moreover, when compared to the designation of only ten mounted policemen to 47th Street in 1985 in response to the announced intention of the Orthodox Jewish counterdemonstrators to blockade the entire Parade, (Tr. 392–3) the court finds it impossible to credit police suggestions that short of calling out the National Guard, *no* number of police officers would have been adequate to check the potential for violence had Dignity been allowed to demonstrate on the sidewalk of St. Patrick's. (Tr. 499.)

The significance of the more fully developed record on this trial to the Second Circuit decision in this case handed down last year, must be underscored. The Circuit panel concluded that in light of various factors supporting police contentions that a substantially greater potential for violence would exist should Dignity's request be

granted, the district court's decision finding plaintiffs to have demonstrated a likelihood of success on the merits was clearly erroneous. The "strong unrefuted evidence," listed by the Circuit Court that the stated potential for violence was not merely speculative, *Olivieri v. Ward*, 766 F.2d at 692–93, has been severely undermined during this trial. Upon closer examination of the factual background of this case, among other factors listed by the Circuit Court last year, the 1983 counterdemonstrators, the opposition of the Catholic War Veterans and the Knights of Columbus, past recruitment mailings by the Committee for the Defense of St. Patrick's, and the public positions of the Catholic Church, are inadequate to support the credibility and rationality of stated police fears for the 1986 parade should Dignity be allowed on the sidewalk.

This trial has also revealed the inaccuracy of the statement that counterdemonstrator groups "overran" police barricades during past Parades, and of the belief that Dignity had previously demonstrated at the Cathedral outside the context of the Parade. Finally, the court notes a significant inaccuracy in the facts as originally considered by the Court of Appeals with regard to the placement of Dignity and the counterdemonstrators during the Gay Pride Parade in 1985. Instead of being assigned to areas adjacent to the Cathedral, *id.* at 691, the counterdemonstrators and the demonstrators were assigned to West 50th Street and West 51st Street respectively, areas that are diagonally across the street a significant distance from the Cathedral sidewalk where Dignity wishes to demonstrate.

Upon careful evaluation of the voluminous evidence in this case the court concludes that police predictions of a significant potential for violence from counterdemonstrators at the 1986 Gay Pride Parade are incredible. Even were the court untroubled by the credibility of police assertions, however, it would find their predictions irrational in view of the negligible support that has been offered for them. The court also finds that any potential for violence at the 1986 Parade will not be significantly affected by the presence of Dignity on the Cathedral sidewalk. Rather, the court concludes that in light of the absence of any heightened potential for violence caused by Dignity's presence on the sidewalk, a more convincing explanation for the police decision to deny Dignity's request is discomfort with the content of Dignity's message. Police sensitivity to the discomfort of counterdemonstrators and the Catholic Church, as well perhaps, as discomfort within the Police Department, itself, with Dignity's message, are more credible explanations for the challenged restriction than any serious concern on the part of the police with an increased potential for violence rising from the mere presence of Dignity on the sidewalk.

CONCLUSIONS OF LAW

■ The Fifth Avenue sidewalk in front of St. Patrick's Cathedral to which plaintiffs in this case seek access is a classic public forum for the exercise of First Amendment rights. *See Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). This sidewalk lies in the heart of a great and pluralistic city that has long flourished as one of the nation's most fertile seedbeds for new and often disturbing ideas. New York City and the police who serve it are exceedingly familiar with controversy and dissension and the often emotional public expression they inspire. The police must daily labor to safeguard the precious First Amendment values of this country while maintaining order and civility against the constantly charged backdrop of this city.

The right to free expression in this society, however, is not unlimited, for good sense and practicality dictate that certain reasonable time, place, and manner restraints be imposed on occasion in the interest of the smooth and safe functioning of daily life. *Grayned v. City of Rockford*, 408 U.S. 104, 115, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972); *International Society for Krishna Consciousness, Inc. v. City of*

*New York,* 484 F.Supp. 966 (S.D.N.Y.1979) (Motley, J.) (upholding as valid time, place and manner restraint police decision to bar plaintiffs' solicitation and proselytizing activities at visitors' gate at the United Nations headquarters, due to well-founded state interest in maintaining traffic flow and protecting safety of U.N. visitors, and by state's legitimate concern with terrorism.) Defendants in this case explain that the restriction on plaintiffs' First Amendment rights here challenged is merely one such reasonable time, place and manner restraint. The relatively straightforward question thus presented by this lawsuit is whether defendants' decision to bar Dignity from its chosen forum in front of St. Patrick's Cathedral can withstand this court's scrutiny and be sustained as a valid time, place and manner restraint on free speech.

Clearly, where fundamental constitutional rights are at stake, a court must not stand back and meekly bow to the protestations of rationality so routinely offered by public officials and agencies. *City of Los Angeles v. Preferred Communications, Inc.,* — U.S. —, —, 106 S.Ct. 2034, 2038, 90 L.Ed.2d 480 (1986). Especially in the context of First Amendment challenges to restraints on the expression of views that are unpopular and, to many, even repulsive, the court must proceed warily. "[T]he excuses offered for refusing to permit the fullest scope of free speech are often disguised, [and] the court must carefully sort through [them] to see if they are genuine." *Olivieri v. Ward,* 766 F.2d 690, 691 (2d Cir.1985). Similarly, where First Amendment values have been balanced with other social concerns, the court " 'may not simply assume that the [restriction] will always advance the asserted state interests sufficiently to justify its abridgment of expressive activity.' " *City of Los Angeles v. Preferred Communications, Inc., supra,* — U.S. at —, 106 S.Ct. at 2038 (quoting *Taxpayers for Vincent,* 466 U.S. 789, 803 n. 22, 104 S.Ct. 2118, 2128 n. 22, 80 L.Ed.2d 772 (1984)).

The standard for assessing the validity of any time, place and manner restriction on the free expression of speech is well-established.[3] The restriction must satisfy three requirements. It must be content-neutral, it must be narrowly tailored to further a significant government interest, and it must leave open ample alternative channels for communication. *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984).

■■■ A constitutional challenge to the validity of a state-imposed time, place and manner restraint on free speech can, in most cases, only find proper resolution after a full development of the underlying factual disputes involved. *See City of Los Angeles v. Preferred Communications, Inc., supra* — U.S. at —, 106 S.Ct. at 2038. Accordingly, in this case brimming with factual controversy about the proper inferences to be drawn from essentially undisputed facts, the court has arrived at its constitutional determination only after a full trial. The court has brought to this trial and its evaluation of the evidence there presented its special experience and skill in making factual determinations on

---

**3.** This standard is similar, though not identical, to the standard applied in reviewing government restrictions on constitutionally protected expressive conduct. Such symbolic expression may be forbidden or regulated if the conduct itself may be constitutionally regulated, if the regulation is narrowly drawn to further a substantial governmental interest, and if the interest is unrelated to the suppression of free speech. *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (governmental interest in clean parks sufficient to justify prohibition of "expressive" overnight camping.) Traditionally, government restrictions on expressive conduct have been upheld where in its more familiar non-expressive context, the conduct has previously been subject to regulation for obvious pragmatic purposes. *See Clark,* supra (overnight camping); *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (destruction of draft registration cards), and where the regulation condemns only the independent noncommunicative impact of the expressive conduct. *United States v. O'Brien, supra,* at 385, 88 S.Ct. at 1683. The present case clearly does not fall into the jurisprudence of expressive conduct.

such vexed issues of motivation, credibility, and reasonableness. See *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Pullman-Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982).

■ The court concludes that plaintiffs must prevail in their challenge to the police restriction of their use of the sidewalk fronting St. Patrick's Cathedral during the 1986 Gay Pride Parade. The restriction cannot pass constitutional muster as a valid time, place and manner restraint for two independent reasons. Each would be adequate to defeat the constitutionality of the restriction.

First, the court finds that the restriction must fail because it is not content-neutral. The matter and not the manner of plaintiffs' message is precisely the reason for its restriction. Defendants have denied Dignity's request to demonstrate in front of St. Patrick's this year directly in response to the complaints of citizens opposed to Dignity's message. The present situation thus presents the effective use of a "heckler's veto," a device which by its nature is content-sensitive and which has been consistently rejected by the courts as an invalid basis for restricting the exercise of free speech in a traditional public forum. *See, e.g., Coates v. City of Cincinnati*, 402 U.S. 611, 615–16, 91 S.Ct. 1686, 1689, 29 L.Ed.2d 214 (1971); *Terminiello v. City of Chicago*, 337 U.S. 17, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). That the veto here has not succeeded in completely silencing plaintiffs' message, but only in restricting its expression, does not change its fundamental nature as a heckler's veto repugnant to long-standing constitutional values. See *Collin v. Chicago Park District*, 460 F.2d 746 (7th Cir.1972).

Defendants have argued that by freezing the sidewalk in front of St. Patrick's to all demonstrators the restriction is perforce content-netural. Indeed, they argue, allowing plaintiffs to use the sidewalk while denying its use to anti-gay counterdemonstrators would defeat the content neutrality of the police decision because it would

amount to a preference for plaintiffs. The court rejects this argument. For one thing, it is logically and constitutionally infirm to conclude that whenever competing groups both wish to use a single forum, the First Amendment or its requirement of content neutrality demand that all speech be barred from that forum entirely. See *Olivieri v. Ward*, 766 F.2d at 696–97 (Kearse, J. dissenting). Content-neutral criteria for granting access to the more desirable and sought after of public fora have long been employed by public officials and upheld by the courts. See *Gay Veterans Association, Inc. v. The American Legion*, 621 F.Supp. 1510 (S.D.N.Y.1985), (Motley, Ch. J.) (parade route validly assigned to its historical holder despite plaintiffs' application for same route during same time; plaintiffs' request to enjoin American Legion Parade denied) (aff'd by the Second Circuit orally from the bench November 8, 1985 without written decision).

More damaging to defendants' argument that evenhandedness to both groups requires the complete freeze of the sidewalk is the factual infirmity of the argument. The counterdemonstrators by their own and by police department testimony are not themselves truly interested in demonstrating on the sidewalk in front of St. Patrick's. Instead, their goal is simply to keep Dignity and other gay demonstrators off the sidewalk.

Defendants have also sought to defend the content neutrality of the restriction at issue here by claiming that although it may appear content-sensitive, the restriction is sensitive merely to the secondary effects of plaintiffs' expression, i.e., the increased potential for violence to which it would give rise. In *City of Renton v. Playtime Theatres, Inc.*, —— U.S. ——, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), a suit placing into question the content neutrality of an ordinance barring adult movie theatres from certain parts of town, the Supreme Court explored a situation where a seemingly content sensitive time, place and manner restriction was able to pass the test of content neu-

trality. The Court found that the "predominate" intent of the ordinance was aimed at the secondary effects of this kind of theatre, i.e., the effects it would have on a neighborhood, for example, as determined by the district court, the lowering of property values, the encouragement of crime, and damage to the city's retail trade. This was adequate, said the Court, to establish that the regulation was unrelated to the suppression of free speech. Where a restriction on free expression is designed to promote traditional state interests in safety and welfare, and is thus "'justified without reference to the content of the regulated speech,'" *City of Renton, supra,* — U.S. —, —, 106 S.Ct. 925, 929, 89 L.Ed.2d 29, 38 (citing *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976) and adding emphasis), the court concluded, it will "not contravene the fundamental principle that underlies [the] concern about 'content-based' speech regulations [i.e., that they will be content based].....'" *City of Renton, supra,* — U.S. —, —, 106 S.Ct. 925, 929, 89 L.Ed.2d 29, 38.

The court rejects defendants' claim that the restriction on Dignity at issue in this case is grounded not in its content but instead in its purported secondary effect, i.e., the violent counterdemonstrator reaction that Dignity's presence on the sidewalk might provoke. The reason for the court's rejection of this "secondary effect" rationale is simply that it does not find that the presence of Dignity on the sidewalk gives rise to any particular secondary effect that might justify the restriction. The court has stated its factual conclusion that police estimations of the special potential for violence in this year's Gay Pride Parade, and particularly from Dignity's presence on the Cathedral sidewalk, are neither credible nor rational. The mere allegation that Dignity's presence on the sidewalk will produce a particular secondary effect is obviously insufficient to clear the restriction from the taint of content sensitivity. Moreover, no other reason has been offered, such as a time-conflict with sched-

uled events in the Cathedral, or the simultaneous application of several groups for the same spot, to justify the restriction here imposed.

In arriving at its conclusion that the exclusion of Dignity from the Cathedral sidewalk is not content-neutral, the court relies on more than its perception of the pretexual nature of the police assertions of an increased risk of violence. This total absence of any credible reason for the restriction might well suffice for an inferential conclusion that the restriction is not content-neutral as alleged. In the present case, however, the pretextual nature of the justification stands alongside the existence of a heckler's veto as well as the presence of a certain excessive sensitivity to the Catholic Church on the part of police officials, to support the court's assessment that the restriction here is not content neutral.

The historical evidence of police sympathy with the Church is evidenced in particular by the secret meeting with Church officials in 1983 and the peculiar language of the memo it spawned which, indeed, reads as if the police were responding to a Church request and planned to offer *post facto* public safety rationales to the world at large. Also extremely unsettling is the evidence of police communications with the Cathedral in 1984 proposing that church services be scheduled during the Parade to help the police reimpose the sidewalk freeze that year. While standing alone this evidence of historical police complicity with the Church might be inadequate to support a finding that the 1986 restriction is not content-neutral, the cumulative evidence, both affirmative and negative, of content sensitivity in this case clearly supports such a conclusion.

The court finds separate and independent grounds for striking the restriction in question here in the second prong of the time, place and manner inquiry into the constitutionality of the police decision. The restriction imposed on Dignity is not adequately tailored to further a significant governmental interest. While there can be little ques-

tion that the maintenance of public order and the prevention of street violence are in themselves significant governmental interests, see *Concerned Jewish Youth v. McGuire*, 621 F.2d 471, 474 (2d Cir.1980), there has been little convincing evidence in this case that these interests would in any way be threatened by Dignity's presence on the sidewalk, or conversely, promoted by its absence. Thus, there is a real question whether the restriction at issue here is rationally related to the furtherance of a significant governmental interest, much less narrowly tailored to its promotion.

Aside from the general lack of credible evidence that Dignity's absence from the sidewalk would in any way promote the government's interest in peaceableness, two aspects of the evidence particularly underscore the lack of rational relation between the challenged measure and public safety. The first is the court's finding that the only credible potential provocation for violence by counterdemonstrators during the Gay Pride Parade lies not in Dignity but in the more dramatic and anti-Catholic expressions of the other gay demonstrators.[4] These, and the counterdemonstrator outrage at the Parade generally, are something with which the police must deal in any event and do not appear to this court to be substantially affected by whether or not Dignity is allowed to demonstrate on the sidewalk.

The second salient indication of the irrationality of the decision to keep Dignity off the sidewalk derives from a comparison of this request with the Parade-stopping street ceremony that Dignity is now allowed. In the court's judgment, the street ceremony provides a provocation fairly equivalent to the one that Dignity's limited

access to the Cathedral sidewalk would create. Not only is the fifteen minute street ceremony a more dramatic event, because more focused than a Parade-long demonstration by Dignity on the sidewalk would probably be, it is also located significantly closer to the counterdemonstrators than Dignity's requested sidewalk location on the east side of Fifth Avenue in front of the Cathedral. Standing in the avenue and spanning the Cathedral block, as the Dignity group now does during this ceremony, (*see* PX 195), they are in better sight of the counterdemonstrators, as well as within easier access, than they would be across the street on the Cathedral sidewalk demonstrating in a barricaded pen. Thus the court fails to understand how keeping Dignity from the sidewalk, and instead allowing them their Parade-stopping Fifth Avenue ceremony, is rationally related to the furtherance of any significant public interest.

Even putting aside its doubts as to the rationality of the police decision to bar Dignity from the sidewalk, however, the court finds that the restriction on Dignity is not narrowly tailored to promote the interest it is designed to serve. While the legitimate government interest in public order is in no way contested, it must be understood that where the threat to the implicated government interest is minor, the severity of the allowable restriction must also be lesser. Here, where the court has found that the threat to public order inherent in Dignity's provocative existence and speech is minimal, the justifiable restriction is also minimal. The mere speculative possibility of violence—present in even the most innocuous of public demonstrations—is surely not a sufficient affront to the government

---

**4.** That the potential for violence by provocative acts of certain of the most extreme gay demonstrators is somewhat credible, and thus that *their* placement on the sidewalk could be unwise, in no way leads to the conclusion that the drastic step of freezing the sidewalk to all must be taken. There is no evidence that any of these other gay groups have specifically requested access to the sidewalk this year. The question of whether a prohibition from the Cathedral sidewalk of the Man-Boy Love Association or of

blasphemous costumed figures would constitute a valid restraint because of the true risk that such expressions might in fact create is not now before the court and thus need not be considered. The only question now before the court is whether there is in fact a real potential for extreme violence from Dignity's access to the sidewalk such that the police restriction constitutes a valid time, place and manner restraint.

878

interests involved to justify unexamined abridgements of free speech. If this were the case there would be a good argument for barring political rallies from populated areas altogether and suggesting instead that protestors take out an ad in *The New York Times.*

Moreover, to the extent that the threats to public order at the Gay Pride Parade concededly find their immediate source in the counterdemonstrators, it is of course they, and not Dignity, who should most logically be targeted for restraint.

The court finds that a decision to prevent completely Dignity's access to the Cathedral sidewalk is too severe in relation to the government interest to be served. In light of the more marked counterdemonstrator annoyance with the presence of demonstrating gays on the very steps of the Cathedral, a decision to keep Dignity off the Cathedral steps might conceivably be justifiable, notwithstanding the property owner's failure to demand such action. The court finds, however, that a plan which would allow Dignity limited access to the Cathedral sidewalk for the duration of the Parade, represents the correct constitutional measure of tailoring on Dignity's expression, in light of the governmental interest in maintaining order during the Parade that is implicated here. The police plan formulated in response to this court's order last May 1985, that would have provided for the placement of fifty to a hundred Dignity members in a demonstration pen on the Cathedral sidewalk, is a more precise example of what the court has in mind. The court is confident that such a plan will adequately guarantee the government interest in peace, for it does not credit police department assertions that the police created an inadequate plan in response to the court's 1985 order.

Having found that defendants' decision to bar Dignity from the St. Patrick's sidewalk during the Gay Pride Parade is neither content-neutral nor narrowly tailored to promote the public interest implicated, it is unnecessary to decide whether the sidewalk freeze allows Dignity adequate alternatives for the expression of its message. The court expresses no opinion in this regard. Furthermore, having found the restriction here challenged to be constitutionally infirm as a valid time, place and manner restraint on two independent grounds, the court need not address plaintiffs' contentions that the restriction violates the Establishment Clause of the First Amendment or the New York State Constitution.

*Attorney Fees*

■ Plaintiffs have requested attorney fees under 42 U.S.C. Section 1988. 42 U.S.C. Section 1988 does not specifically provide for attorney fees to prevailing parties in claims under the federal constitution generally. Plaintiffs have not specifically alleged a violation of 42 U.S.C. Section 1983. Section 1988 is thus not available to plaintiffs to support their request for attorney fees. Because the court knows of no other statute that would serve as explicit statutory authority for an award of attorney fees in this case, nor have plaintiffs offered any such authority, the request for attorney fees is denied. See *Alyeska Pipeline Service Co. v. The Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

CONCLUSION

■ Plaintiffs' request for a permanent injunction enjoining defendants from preventing up to one hundred members of plaintiff Dignity-New York from holding a peaceful demonstration on the sidewalk in front of St. Patrick's Cathedral on Fifth Avenue between Fiftieth and Fifty-First Streets in New York City during the "Gay Pride Parade" on Sunday, June 29, 1986 or during subsequent annual Gay Pride Parades, for the duration of the Parade in the Cathedral area, is hereby granted. The court declares that defendants' decision to prohibit Dignity access to the sidewalk of St. Patrick's Cathedral during the Gay Pride Parade of 1986 is an unconstitutional restraint on plaintiffs' First Amendment free speech rights.

Plaintiffs request for an award of attorney fees is denied.

### ORDER

In accordance with the court's opinion in the above-captioned case filed simultaneously herewith, the court

DECLARES, ADJUDGES AND DECREES, pursuant to 28 U.S.C. Section 2201 *et seq.*, that, under the circumstances developed at the trial in this case, defendants' practice of preventing plaintiffs from conducting a peaceful prayer demonstration on the public sidewalk in front of St. Patricks's Cathedral during the annual "Gay Pride Parade" is an infringement of plaintiffs' rights of free speech and does not constitute a reasonable time, place and manner regulation; and it is further

ORDERED that defendants are hereby enjoined from preventing up to one hundred members of plaintiff Dignity-New York from holding a peaceful demonstration on the sidewalk in front of St. Patrick's Cathedral on Fifth Avenue between Fiftieth and Fifty-First Streets in New York City during the "Gay Pride Parade" on Sunday, June 29, 1986 or during subsequent annual Gay Pride Parades, for the duration of the Parade in the Cathedral area; and it is further

ORDERED that nothing in this order should be construed as prohibiting defendants from maintaining order through more restrictive emergency measures if public order and safety are imminently threatened by unforeseen circumstances which arise during the Parade itself; and it is further

ORDERED that defendants may apply to the Court in future years to modify this injunction if they in good faith believe that a substantial change in circumstances has occurred which would justify more restrictive measures to be exercised with respect to plaintiffs' demonstration; and it is further

ORDERED that plaintiffs' request for an award of attorney fees pursuant to 42 U.S.C. Section 1988 is denied.

So ordered.